DAN RAYFIELD
Attorney General
LEANNE HARTMANN #257503
BRIAN SIMMONDS MARSHALL #196129
KIRSTEN NAITO #114684
Senior Assistant Attorneys General
SARA DEL RUBIN #232414
DEREK OLSON #225504
Assistant Attorneys General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Leanne.Hartmann@doj.oregon.gov
            Brian.S.Marshall@doj.oregon.gov
            kirsten.m.naito@doj.oregon.gov
            sara.delrubin@doj.oregon.gov
            derek.olson@doj.oregon.gov

Attorneys for the State of Oregon

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| STATE OF NEW YORK, et al., <br><br> Plaintiffs, <br><br> v. <br><br> BROOKE ROLLINS, in her official capacity as Secretary of the U.S. Department of Agriculture, et al., <br><br> Defendants. | Case No.  6:25-cv-02186-MTK <br><br> DECLARATION OF PETER HADLER |

## DECLARATION OF PETER HADLER

I, Peter Hadler, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a resident of the State of Connecticut. I am over the age of 18 and understand the obligations of an oath.

2.      I am the Deputy Commissioner for the Connecticut Department of Social Services ("DSS" or "Department"). I have been employed in this position since April 2023 and have been employed by DSS since January 2012. I am responsible for executive level program and policy oversight and administration of eligibility policy and enrollment determinations for the Medicaid program and the Children's Health Insurance Program (CHIP), among other healthcare programs. In my capacity as Deputy Commissioner, I also oversee the state's program and policy administration for the Supplemental Nutrition Assistance Program (SNAP), the Temporary Assistance for Needy Families block grant, the Low-Income Home Energy Assistance block grant, the Community Services Block Grant (CSBG), and numerous other public assistance programs.

3.      I make this declaration based on personal knowledge or have knowledge of the matters herein based on my review of information and records gathered by agency staff.

4.      DSS is statutorily designated in Connecticut General Statutes section 17b-2 as the state agency responsible for "the administration of (1) the Connecticut energy assistance program pursuant to the Low Income Home Energy Assistance Act of 1981; (2) the state plan for vocational rehabilitation services for the fiscal year ending June 30, 1994; (3) the refugee assistance program pursuant to the Refugee Act of 1980; (4) the legalization impact assistance

1

grant program pursuant to the Immigration Reform and Control Act of 1986; (5) the temporary assistance for needy families program pursuant to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996; (6) the Medicaid program pursuant to Title XIX of the Social Security Act; (7) the supplemental nutrition assistance program pursuant to the Food and Nutrition Act of 2008; (8) the state supplement to the Supplemental Security Income Program pursuant to the Social Security Act; (9) the state child support enforcement plan pursuant to Title IV-D of the Social Security Act; (10) the state social services plan for the implementation of the social services block grants and community services block grants pursuant to the Social Security Act; and (11) services for persons with autism spectrum disorder."

     5.     Among other statutory duties, pursuant to section 17b-3 of the Connecticut General Statutes, the Department has the power and duty to "(1) Administer, coordinate and direct the operation of the department; . . . (4) establish and develop programs and administer services to achieve the purposes of the department as established by statute; . . . (9) promote economic self-sufficiency where appropriate in the department's programs, policies, practices and staff interactions with recipients; (10) act as advocate for the need of more comprehensive and coordinated programs for persons served by the department; (11) plan services and programs for persons served by the department; . . . (15) encourage and facilitate effective communication and coordination among federal, state, municipal and private agencies; (16) inquire into the utilization of state and federal government resources which offer solutions to problems of the delivery of social services; (17) conduct, encourage and maintain research and studies relating to social services development; (18) prepare, review and encourage model comprehensive social service programs; (19) maintain an inventory of data and information and act as a clearing house and referral agency for information on state and federal programs and services; . . . The

Commissioner of Social Services is authorized to do all things necessary to apply for, qualify for and accept any federal funds made available or allotted under any federal act for social service development, or any other projects, programs or activities which may be established by federal law, for any of the purposes or activities related thereto, and said commissioner shall administer any such funds allotted to the department in accordance with federal law."

6. SNAP, one of the programs administered by DSS, involves the issuance of monthly electronic benefits that can be used to purchase food at authorized retail stores.

### *SNAP in Connecticut*

7. SNAP is a key part of Connecticut's efforts to address hunger by supplementing the food budget of low-income families so they can purchase healthy food. Thus far in 2025, an average of approximately 366,000 people received SNAP benefits in Connecticut each month, including approximately 215,000 families and 120,000 children. Households in Connecticut receive on average $324 per month in SNAP benefits to meet their basic subsistence and nutritional needs. During the federal fiscal year between October 1, 2024, and September 30, 2025, DSS issued approximately $72,000,000 per month in SNAP benefits in Connecticut.

8. DSS administers the SNAP program in Connecticut pursuant to Section 17b-2 of the Connecticut General Statutes. Pursuant to federal law, DSS administers SNAP on behalf of the United States Department of Agriculture (USDA) and is responsible for the issuance, control, and accountability of SNAP benefits; ensuring program integrity; and day-to-day administration of SNAP, including processing applications for SNAP benefits and certifying eligible applicant households. 7 U.S.C. § 2020(a)(1); 7 C.F.R. § 271.4; 7 C.F.R. § 274.2. USDA funds the entirety of SNAP benefits in Connecticut, though Connecticut and the federal government split administrative costs. 7 U.S.C. § 2025(a).

9. For Federal Fiscal Year 2025, DSS will pay approximately $155,000,000 in state funds to administer the SNAP program. This spending is expected to generate approximately $77,500,000 in SNAP federal financial participation, to cover half of anticipated administration costs.

### *Public Law 119-21 (the One Big Beautiful Bill Act of 2025)*

10. On July 4, 2025, President Donald J. Trump signed into law Public Law 119-21, the One Big Beautiful Bill Act of 2025 (OBBB).

11. Section 10108 of the OBBB, titled "Alien SNAP Eligibility," made changes to the eligibility of certain categories of non-citizens for SNAP benefits, amending section 6(f) of the Food and Nutrition Act of 2008, 7 U.S.C. 2015(f).

### *USDA's October 31, 2025, SNAP Guidance*

12. On October 31, 2025, USDA issued guidance ("the Guidance"), which purports to explain the changes to non-citizens' eligibility for SNAP benefits required by Section 10108 of Public Law 119-21.

13. I and others at DSS have reviewed the Guidance and 7 U.S.C. 2015(f), as amended by the OBBB. DSS' understanding and belief is that the Guidance is inconsistent with other laws and regulations regarding SNAP eligibility that we understand to be unchanged by the OBBB.

14. On October 31, 2025, USDA sent DSS the Guidance via e-mail through the Food and Nutrition Service (FNS) Northeast Regional Office Director.

15. There has been no additional communication between DSS and the USDA regarding the Guidance, which may be because the Guidance was issued during the federal government shut down and most of the USDA FNS Regional Office staff were furloughed.

16. Upon their return to work, USDA staff have made no indication of forthcoming additional guidance or clarifications regarding the Guidance.

### *Implementation of the OBBB and the Guidance by DSS*

17. DSS determines non-citizen immigration status for purpose of verification for SNAP through various avenues. Applicants and beneficiaries can provide documentation of their immigration status using a variety of forms and identification documents, including but not limited to visas, I-94 forms, permanent residency cards, passports, and notices from relevant federal agencies. DSS uses the Systematic Alien Verification for Entitlements (SAVE) Program, a federal electronic database, as part of the verification process. DSS staff enter biographic information into the SAVE system to get a response that identifies federal records of citizenship/immigration status. If initial SAVE responses are inconclusive, DSS will take action to trigger additional federal review within the SAVE Program as well as collect verification documentation directly from applicants/beneficiaries.

18. Non-citizen immigration status must be identified and recorded manually by DSS eligibility staff into the DSS eligibility computer system. This includes descriptions of any documentary evidence provided by applicants or beneficiaries, as well as the results returned from the SAVE Program. Federal data, including changes in immigration status, are not recorded in the state system automatically, but must be transposed and entered case-by-case by state staff.

19. In order to comply with OBBB eligibility changes, DSS operations and systems must undergo a number of corresponding changes. The DSS eligibility system must be reprogrammed to delineate between eligible and ineligible immigration statuses. Staff must be educated and trained to understand and process non-citizen cases in accordance with federal rules and the limitations of the eligibility system before it is reprogrammed. Each individual case

where a household member may have a change in immigration status, such as from refugee to legal permanent resident, must undergo additional review and manual updating within the eligibility system to ensure accuracy and appropriate eligibility results. Many cases will need to be resubmitted through the SAVE Program.

20. In the four months following the passage of the OBBB, Connecticut began to take steps to implement OBBB's changes to non-citizen eligibility for SNAP. This included working with our eligibility operations and information technology teams to identify any non-citizen currently receiving SNAP assistance in Connecticut. Staff members designed reporting templates and approaches for extracting relevant data from the DSS eligibility system. DSS identified eligibility staff capacity and operational funding, and policy staff began drafting guidance and training materials on how to adjust noncitizen immigration statuses under OBBB requirements as they were understood prior to the Guidance. DSS staff also entered relevant non-citizen data into the SAVE Program to assess and identify individuals' potentially adjusted statuses and resulting impact on benefit eligibility. However, internal guidance and operational changes could not be finalized without clarification of elements necessary to confirm the State's understanding, such as the appropriate date to record for the start of the five-year wait period for benefit eligibility. In particular, DSS was waiting for guidance on effectuating these changes, such as whether they would be applied at recertification/application or some other cadence, and how to determine eligibility for cases where an individual's immigration status was adjusted (such as from refugee to legal permanent resident). DSS participated in calls with the National Association of SNAP Directors, where questions related to non-citizen eligibility were raised and submitted to FNS.

21. The issuance of the Guidance that suggested a new set of rules for individuals who were originally admitted as humanitarian non-citizens, such as refugees and asylees, forced

the agency to reexamine the immigration statuses of SNAP recipients who originally had such a status and may have later adjusted their status. Based upon the State's understanding of OBBB changes prior to the Guidance, such humanitarian non-citizens should potentially have been able to maintain benefits. The issuance of the Guidance introduced new ambiguity and caused the agency to pause the issuance of internal guidance and training, as well as system updates, pending additional necessary clarification from FNS which, to date, has not been issued.

22. Due to the lack of clarity and apparent legal inaccuracies in the Guidance, DSS is unable to fully implement changes without the risk of needing to redo work with scarce resources that are already pushed to the limit with implementing other federal rules changes, or the risk of increased payment error rates and corresponding massive financial penalties, or the risk of improper benefit terminations and the clear and direct harm to eligible beneficiaries (as well as potential payment errors). None of these are viable options.

*__Impact of the Guidance on Connecticut and DSS__*

23. The Guidance has caused significant confusion and administrative difficulties for DSS, disrupting DSS' ability to implement the OBBB's changes to non-citizen SNAP eligibility. The changes made by OBBB to long-standing eligibility rules concerning non-citizens already resulted in some degree of confusion among eligibility staff within DSS. The Guidance has exacerbated this confusion at the idiomatic eleventh hour by creating added ambiguity insomuch as it suggests certain categories of humanitarian non-citizens, such as refugees and asylees, are not eligible for SNAP even if they adjust their status to permanent residence, and that these non-citizens, even if eligible, are subject to a five-year waiting period. This guidance was unexpected given that it appears to contradict actual statutory language, such as the provisions of 8 U.S.C. 1611, *et seq.* This places DSS in the unenviable position of deciding whether to issue new

direction to eligibility and information-technology staff based on the Guidance, or to follow the rules set forth in statute, all with the specter of error-rate penalties hanging over the agency.

24. As described above, DSS has already invested significant time and resources into planning and beginning to implement the changes to non-citizen SNAP eligibility made by the OBBB. Implementing the Guidance will increase the costs required to implement the changes required by OBBB. Specifically, DSS will need to:

   a. redesign and reprogram DSS eligibility systems;
   b. update websites and other information repositories;
   c. rewrite interim business process guidance and operational directives;
   d. re-train staff;
   e. reexamine the eligibility of non-citizen applicants and beneficiaries;
   f. handle additional administrative hearings; and
   g. expand capacity to handle additional client questions in offices and over the telephone.

25. The Guidance elevates the risk that Connecticut will face massive financial penalties due to inadvertent noncompliance with OBBB and/or the Guidance. Section 10105 of the OBBB created a new set of penalties for States tied to their payment error rates. The Guidance stated that the "exclusionary period"—that is, the period during which errors do not count towards a state's error rate—ended on November 1, 2025, the day after the guidance was issued. Historically, there are more errors as agencies figure out how to implement new guidance, especially when given no time to make the corresponding necessary changes to its eligibility system to accommodate the new guidance. Thus, USDA may attempt to count any so-called "errors" stemming from the Guidance as part of Connecticut's error rate, increasing the

risk that Connecticut may have to pay financially ruinous penalties. And USDA claims the authority to be able to count those errors starting November 1, 2025, leaving only a one-day period for compliance, further increasing the chance of these penalties.

26. DSS's understanding of the Guidance is that it appears to exclude certain categories of non-citizens from SNAP who appear to be eligible under the OBBB and other eligibility requirements that were unchanged by the OBBB. Under the Guidance, thousands of non-citizens within Connecticut will be excluded from SNAP. This will harm Connecticut and DSS.

27. The loss of SNAP benefits will result in greater need and requests for state-funded assistance programs, including, for example, state-funded cash assistance programs as well as put further strain on the broader food system in the state including the state's food banks and pantries.

28. The lack of clarity regarding non-citizen eligibility caused by the Guidance will significantly erode trust between Connecticut and its residents. To properly effectuate its safety net programs, DSS has devoted years of work to overcome stigma, misinformation, and other barriers to access, particularly among immigrant communities. If households experience uncertainty in receiving crucial benefits, they are likely to feel that DSS failed or engaged in wrongdoing. SNAP benefits directly fund one of the most crucial basic human needs: access to food. Failure to deliver on that basic need as promised is a deep violation of residents' trust.

29. Furthermore, loss of trust among Connecticut residents will likely lead to a chilling effect among various immigrant communities, leading to decreased SNAP enrollments, which in turn will cause irreparable long-term harm and costs to the State in the form of

increased healthcare and safety net costs, and expending of state resources to rebuild trust in the public agency.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct. Executed in New Haven, Connecticut on November 24th, 2025.

                                                                  Peter Hadler
                                                                   Peter Hadler

*Digitally signed by Peter Hadler. DN: cn=Peter Hadler, o=DSS, ou=Deputy Commissioner, email=peter.hadler@ct.gov, c=US. Date: 2025.11.24 16:41:48 -05'00'*

CERTIFICATE OF SERVICE

      I certify that on November 26, 2025, I served the foregoing upon the parties hereto by the method indicated below, and addressed to the following:

| | |
|---|---|
| Susanne Luse | ___ HAND DELIVERY |
| Assistant United States Attorneys | ___ MAIL DELIVERY |
| U.S. Attorney's Office for the District | ___ OVERNIGHT MAIL |
| of Oregon | ___ TELECOPY (FAX) |
| 1000 SW Third Ave. Suite 600 | ___ E-SERVE |
| Portland, OR 97204 | _X_ E-MAIL |
| | susanne.luse@usdoj.gov |

 *s/ Leanne Hartmann*
LEANNE HARTMANN #257503
BRIAN SIMMONDS MARSHALL #196129
KRISTEN NAITO #114684
Senior Assistant Attorneys General
SARA DEL RUBIN #232414
DEREK OLSON #225504
Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Leanne.Hartmann@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov
kirsten.m.naito@doj.oregon.gov
sara.delrubin@doj.oregon.gov
derek.olson@doj.oregon.gov

*Counsel for the State of Oregon*

Page 1 -   CERTIFICATE OF SERVICE
LH5/om1/1002822308

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000