DAN RAYFIELD
Attorney General
LEANNE HARTMANN #257503
BRIAN SIMMONDS MARSHALL #196129
KIRSTEN NAITO #114684
Senior Assistant Attorneys General
SARA DEL RUBIN # 232414
DEREK OLSON # 225504
Assistant Attorneys General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Leanne.Hartmann@doj.oregon.gov
        Brian.S.Marshall@doj.oregon.gov
        kirsten.m.naito@doj.oregon.gov
        sara.delrubin@doj.oregon.gov
        derek.olson@doj.oregon.gov

*Attorneys for the State of Oregon*

[Additional counsel to appear on signature page]

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
### EUGENE DIVISION

| | |
|---|---|
| STATE OF NEW YORK; STATE OF OREGON; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAIʻI; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON; and STATE OF WISCONSIN, | Case No.: 6:25-cv-02186-MTK<br><br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | |
| v. | |
| BROOKE ROLLINS, in her official capacity as Secretary of the U.S. Department of Agriculture; and U.S. DEPARTMENT OF AGRICULTURE, | |
| Defendants. | |

## INTRODUCTION

1.     The Supplemental Nutrition Assistance Program, or SNAP, provides life-saving food assistance to low-income households across America. It is jointly administered by the U.S. Department of Agriculture (USDA) and State governments and largely paid for by USDA. For decades, it has helped children, families, the elderly, and disabled Americans put nutritious food on their tables. For Plaintiff States, SNAP benefits are one of the best tools they have to fight hunger and ensure that children and families have what they need to thrive.

2.     Eligibility for SNAP benefits is based on income and other factors, including immigration status. In July 2025, Congress enacted H.R.1, the One Big Beautiful Bill Act (OBBB), which made several changes to SNAP eligibility rules and how benefits are calculated. As relevant here, the OBBB narrowed the categories of non-citizens who are eligible for SNAP benefits, modified how recipients' utility bills are counted for SNAP (the "standard utility allowance," or "SUA"), and changed exceptions to work requirements for able-bodied adults without dependents ("ABAWDs"). The OBBB simultaneously created a set of massive penalties tied to State error rates in issuing payments to SNAP beneficiaries.

3.     USDA waited nearly two months before issuing its first guidance implementing the OBBB and nearly four months before it issued implementing guidance about the non-citizen eligibility provisions of the OBBB to States, on October 31, 2025.

4.     States typically rely on USDA guidance to implement statutory changes to SNAP to ensure they are complying with the agency's interpretation of the law. In recognition that States need time to fully implement new changes to their SNAP programs correctly, the SNAP statute and regulations provide a 120-day period during which State payment errors are waived for the purpose of calculating their payment error rate, called the "exclusionary period." In the past, the agency began the exclusionary period *after* USDA issued its implementing guidance to the States, providing States at least 120 days after receiving guidance to enact program changes, in line with the SNAP statute and regulations.

5. However, the guidance memoranda that USDA issued following the OBBB informed States that the exclusionary period had started running on July 4, 2025—the day that OBBB was enacted—even though the guidance memoranda came long after that date. On August 29, 2025, USDA issued guidance about Section 10103 of the OBBB, which changed how the standard utility allowance is calculated in determining SNAP benefit amounts, stating that the exclusionary period ended November 1. On October 3, 2025, USDA issued guidance about Section 10102(a) of the OBBB, which changed the exceptions from work requirements for able-bodied adults without dependents, or ABAWDs, stating that the exclusionary period ended November 1. And on October 31, 2025, USDA issued guidance on non-citizen eligibility, informing States the exclusionary period would end the very next day, November 1, 2025 (a Saturday).

6. In addition to ending the exclusionary period too soon, the October 31 guidance on non-citizen eligibility arbitrarily excluded from SNAP many lawful permanent residents who remain eligible under the statutory scheme established by Congress.

7. Many of the Plaintiff States wrote to USDA, asking them to rescind, correct, and reissue the non-citizen guidance, because it was contrary to law and capricious. Plaintiff States received no response from USDA. Keenly aware that tens of thousands of lawful permanent residents in Plaintiff States faced immediate ineligibility for crucial SNAP benefits and that the States themselves faced not only a significant burden in administering the Guidance, but also devastating financial penalties if they do not do so immediately, Plaintiff States filed suit.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States). Jurisdiction is also proper under the judicial review provisions of the APA. 5 U.S.C. §§ 702, 704. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705, 706.

9. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to the claims asserted herein

occurred in this district, and Defendants are United States agencies or officers acting in their official capacities. The capitol of Oregon and the principal offices of the Oregon Department of Human Services are in Marion County, and a substantial part of the events giving rise to this Complaint occurred and continue to occur within Marion County and the District of Oregon.

## PARTIES

### A.    Plaintiffs

10.    Plaintiff the State of New York is a sovereign state of the United States of America. As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian, and representative of all residents, and political subdivisions of New York. Attorney General Letitia James is the chief law enforcement officer for New York.

11.    Plaintiff the State of Oregon is a sovereign state of the United States of America. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

12.    Plaintiff the State of California is a sovereign state in the United States of America. California is represented by Attorney General Rob Bonta, who is the chief law enforcement officer of California.

13.    Plaintiff the State of Colorado is a sovereign state in the United States of America. Colorado is represented by Philip J. Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. §24-31-101 to pursue this action.

14.    Plaintiff the State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

15.    Plaintiff the State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del.

1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

16.    Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

17.    Plaintiff the State of Hawai'i is a sovereign state of the United States of America. Hawai'i is represented by Attorney General Anne E. Lopez, Hawai'i's chief legal officer and chief law enforcement officer, who is authorized by Hawai'i Revised Statutes § 28-1 to pursue this action.

18.    Plaintiff the State of Illinois is a sovereign state of the United States of America. Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief law enforcement officer of Illinois and authorized to sue on the State's behalf. Under Illinois law, the Attorney General is authorized to represent the State's interests by the Illinois Constitution, article V, section 15. *See* Ill. Comp. Stat. 205/4.

19.    Plaintiff the State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to Me. Rev. Stat. Ann. tit. 5, § 191.

20.    Plaintiff the State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief legal officer of Maryland.

21.    Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, the Commonwealth's chief legal officer.

22.     Plaintiff the State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

23.     Plaintiff the State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

24.     Plaintiff the State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

25.     Plaintiff the State of New Jersey is a sovereign state of the United States, and by and through Attorney General Jennifer Davenport, brings this action. The Attorney General of New Jersey is the State's chief legal adviser and is authorized to act in federal court on behalf of the State on matters of public concern.

26.     Plaintiff the State of New Mexico is a sovereign state of the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico.

27.     Plaintiff the State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by Attorney General Jeff Jackson, who is the chief law enforcement officer of North Carolina.

28.     Plaintiff the State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

29. Plaintiff the State of Vermont is a sovereign state of the United States of America. Vermont is represented by Attorney General Charity R. Clark, who is Vermont's chief legal officer and is authorized to pursue this action on behalf of the State. Vt. Stat. Ann. tit. 3, § 159.

30. Plaintiff the Commonwealth of Virginia is a sovereign state of the United States of America. Viriginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2-513.

31. Plaintiff the State of Washington is a sovereign state of the United States of America. Washington is represented by Attorney General Nicholas W. Brown. The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern. Wash. Rev. Code § 43.10.030.

32. Plaintiff the State of Wisconsin is a sovereign state of the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

**B.    Defendants**

33. Defendant Brooke Rollins is the Secretary of the United States Department of Agriculture and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of the agency. 7 U.S.C. § 2202. She is sued in her official capacity.

34. Defendant the United States Department of Agriculture (USDA) is a cabinet agency within the executive branch of the United States government that was created by Congress. 7 U.S.C. § 2201.

**BACKGROUND**

**A.    SNAP Provides Life-Saving Assistance to Millions of Americans**

35. SNAP was created by Congress to "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011. SNAP provides electronic benefits that can be used like cash to purchase food. Congress's

purpose in establishing SNAP was to "permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011.

36.    Nearly forty-two million Americans received SNAP benefits in FY 2024. Thirty-five percent of these recipients were children. SNAP benefits help ensure that children in America do not attend school on empty stomachs, that the elderly have the nutritional sustenance they need, that working families have the ability to thrive, and that people in America do not die of starvation.

37.    To qualify for SNAP, applicants must show that their household income is below a certain level and that they meet other threshold requirements. One of those requirements is that they are either a U.S. citizen or they fall within one of the enumerated categories of non-citizens who are eligible for SNAP. The vast majority of SNAP recipients are U.S. citizens, but SNAP benefits have been and continue to be, subject to the limitations described below, available to some groups of non-citizens who are lawfully in the United States.

**B.    Non-Citizen Eligibility for SNAP**

38.    Two separate statutes govern non-citizen eligibility for SNAP benefits: the Food and Nutrition Act of 2008 (FNA), codified at 7 U.S.C. § 2011 *et seq.*, and the Personal Responsibility and Work Opportunity Act (PRWORA), 8 U.S.C. § 1601 *et seq.*

39.    The FNA limits SNAP eligibility to people who are U.S. citizens, U.S. nationals, or individuals who fall within a few specified categories of non-citizens. 7 U.S.C. § 2015(f).

40.    On July 4, 2025, Congress passed the One Big Beautiful Bill Act, Public Law 119-21 (OBBB). Section 10108 amended the FNA, 7 U.S.C. § 2015(f), narrowing the specified categories of non-citizens who are eligible for SNAP benefits. OBBB's effective date was the date of enactment, July 4, 2025.

41.    Prior to the OBBB going into effect, non-citizens who entered the United States as refugees or were granted asylum were eligible for SNAP, based on their status at the time of their admission or parole. This was also true for many who were granted humanitarian parole. OBBB

eliminated these categories of eligibility in the FNA. However, nothing in OBBB prohibits individuals who once held the status of refugees, individuals granted asylum, or parolees from gaining eligibility for SNAP if and when they adjust their status to lawful permanent residents (LPRs).

42.     The FNA, as amended by the OBBB, now restricts SNAP eligibility to only three categories of people who are not U.S. citizens or nationals: (1) immigrants lawfully admitted for permanent residence (LPRs), (2) Cuban and Haitian entrants, and (3) individuals lawfully residing in the United States in accordance with a Compact of Free Association (COFA). 7 U.S.C. § 2015(f).[1]

43.     LPRs, also known as "green card" holders, are individuals who are lawfully authorized to live permanently in the United States. Individuals often hold another immigration status before becoming LPRs, and, if eligible, can go through an application process to become an LPR. For example, individuals who are Refugees or who are granted asylum can apply to become LPRs after residing in the United States for one year in that status. 8 U.S.C. § 1159(a), (b). The process of becoming an LPR for those in the United States is referred to as "adjusting status."

44.     LPRs are eligible for SNAP pursuant to the FNA, 7 U.S.C. § 2015(f), but they must *also* be eligible for SNAP under PRWORA.

45.     Under PRWORA, LPRs are "qualified aliens" and are thus eligible for SNAP so long as they satisfy an "exception" under the statute. 8 U.S.C. § 1641(b)(1) (listing categories of "qualified alien[s]", including LPRs); 8 U.S.C. § 1612(a)(1) (qualified aliens not eligible unless an exception applies); 8 U.S.C. § 1612(a)(2) (listing exceptions).

46.     There are two types of exceptions under PRWORA relevant to LPRs.

---

[1] Immigrants lawfully admitted for permanent residence are defined in sections 101(a)(15) and 101(a)(20) of the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101(a)(15), 1101(a)(20); Cuban and Haitian immigrants are defined in section 501(e) of the Refugee Education Assistance Act of 1980, P.L. 96-422; and individuals lawfully residing in the United States in accordance with a Compact of Free Association are defined in 8 U.S.C. § 1612(b)(2)(G).

Page 9 -    FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

47.    The first type of exception applies if the person has resided in the U.S. as a "qualified alien" for five years. § 1612(a)(2)(L).

48.    The second type of exception does not require any waiting period. The PRWORA statute provides approximately a dozen categories of individuals who are eligible for SNAP benefits under PRWORA without a waiting period. Those include, for example, individuals who are blind or disabled, § 1612(a)(2)(F), children, § 1612(a)(2)(J), LPRs who have worked 40 qualifying quarters of coverage, § 1612(a)(2)(B), or for the first seven years after an individual was admitted as a refugee or granted asylum, §§ 1612(a)(2)(A)(i)-(ii).

49.    The OBBB did not amend PRWORA or these exceptions.

**C.    Plaintiff States Administer SNAP Benefits to Ensure that Families and Individuals Can Meet Their Essential Needs**

50.    The Food and Nutrition Service (FNS), which is located within the USDA, oversees SNAP, but it is the States that are tasked with administering the SNAP program, determining eligibility, and distributing benefits. 7 U.S.C. §§ 2013, 2020. Plaintiff States each administer their own SNAP program.

51.    Prior to the passage of the OBBB, States shared the administrative costs of running the SNAP program with the federal government, but the federal government paid the entirety of the cost of actual SNAP benefits themselves.

52.    Section 10105 of the OBBB amended the FNA to create a new "State Quality Control Incentive" provision, under which a State is penalized with an increasing share of the cost of SNAP benefits if its payment error rate goes above a percentage threshold. Under the OBBB, starting in Fiscal Year (FY) 2028, if a State's "payment error rate" in either FY 2025 or FY 2026 is equal or greater than 6% but less than 8%, it must fund 5% of the cost of benefits paid to its residents. 7 U.S.C. § 2013(a)(2)(B)(i). If a State's payment error rate is equal or greater than 8% but less than 10%, the State's share of the cost of benefits paid to its residents increases to 10%. *Id*. And if a State's payment error rate is equal to or greater than 10%, it will be responsible for

funding 15% of the cost of the benefits paid to its residents. *Id*. For context, in FY 2024, the average State payment error rate was 10.93%, and only eight States had a payment error rate under 6%.

53.     Even though States will not be required to pay these penalties until FY 2028, the penalty assessed for each state in both FY 2028 and FY 2029 will be determined based on a State's error rate in FY 2026—the current fiscal year.

54.     Specifically, each State's FY 2028 payment is calculated using the State's payment error rate from either FY 2025, which has already concluded, or FY 2026, which is already underway. 7 U.S.C. § 2013(a)(2). Further, beginning in FY 2029, penalties will be based on States' error rates from three years prior, meaning that the FY 2029 penalty will be calculated based on FY 2026. § 2013(a)(2)(B)(ii)(II).[2] The States therefore must prepare to be penalized in FY 2028 and 2029 based on errors that happened last fiscal year or are happening in the current fiscal year.

55.     While Plaintiff States have long worked to keep their payment error rates low, the new provisions of the OBBB create massive penalties for increases in those rates, regardless of whether the State was to blame for errors.

56.     For Plaintiff New York, the State already pays roughly $400 million a year in administrative costs for the SNAP program. In FY 2024, SNAP recipients received approximately $7.35 billion in SNAP benefits. If benefits levels remain steady through FY 2028 and New York's payment error rate was above 6%, it would suddenly be required to pay an additional $367.5 million. If New York's payment error rate strayed above 8%, New York would be required to pay $735 million. And if New York's payment error rate was above 10%, the State would have to pay nearly $1.2 billion.

57.     Because the implementation of new guidance is often accompanied by an uptick in errors, USDA regulations provide for a "120-day exclusionary period" for the Department's error

---

[2] While the statute delays implementation of these extraordinary penalties until FY 2029 or FY 2030 for States who had especially high error rates in FY 2025 or FY 2026, States will not know until after the current fiscal year (FY 2026) concludes if they qualify to delay implementation until Fiscal Year 2030. *Id.* § 2013(a)(2)(B)(iii). At that point, States will suffer penalties at rates determined based on their error rates from FY 2027. *Id.*

analysis, following "application of a new Program regulation or implementing memorandum of a mandatory or optional change in Federal law." 7 C.F.R. § 275.12(d)(2)(vii). During that period, the exclusion "appl[ies] to any action taken on a case directly related to implementation of a covered provision." *Id*. There are exceptions to the exclusionary rule, for instance, for any errors "which occur prior to the States implementation" or for States "which did not implement until after the exclusion period." 7 C.F.R. § 275.12(d)(2)(vii)(B), (C).

58.     Because of the OBBB's new "State Quality Control Incentive" provision, the cost to States of any increase in their error rates can be severe. The 120-day exclusionary period is thus a crucial part of the Plaintiff States' ability to manage costs of administering the SNAP program and avoid the worst of the OBBB's penalties.

59.     On September 4, 2025, USDA issued an "Information Memorandum" ("Information Memo"), in which the agency described the "SNAP provisions and effective dates for most provisions." A copy of the Information Memo is appended hereto as ***Exhibit C***. The agency promised that "FNS will, as appropriate, hold States harmless for Quality Control (QC) purposes for 120 days from the implementation date" and that it would issue "detailed guidance on implementation of [OBBB's] provisions" by September 30. While the Information Memo described in detail some provisions of the OBBB, as to Section 10108, the memo simply said: "This provision makes changes to non-citizen eligibility for SNAP. Further guidance is forthcoming."

### D.     USDA Issues Guidance Interpreting the OBBB's Provisions Regarding Non-Citizens

60.     On October 31, 2025, FNS issued a guidance memorandum to SNAP State Agencies (the "Non-Citizen Guidance"), which purports to implement changes to non-citizens' eligibility for SNAP benefits effectuated by Section 10108 of the OBBB. The Non-Citizen Guidance is appended hereto as ***Exhibit A***. The Non-Citizen Guidance was issued when the federal government was shut down due to a lapse in appropriations, and when FNS staff was furloughed.

USDA cancelled pre-scheduled calls with States and the American Public Human Services Association (APHSA), restricting Plaintiff States' ability to seek clarification on the Guidance.

61.    The Non-Citizen Guidance errs in three separate ways. *First*, although it implies that certain categories of non-citizens will never be eligible for SNAP benefits, those non-citizens *can* be eligible for SNAP benefits if they adjust status and become LPRs. *Second*, the Non-Citizen Guidance omits certain groups of LPRs from a list of groups that are exempt from the five-year waiting period imposed by PRWORA, even though the omitted groups are not required to wait five years to be eligible for SNAP. And *third*, the Non-Citizen Guidance provides a one-day exclusionary period, even though a 120-day exclusionary period is required by regulation.

***Non-Citizens Who Adjust Status and Become LPRs***

62.    The Non-Citizen Guidance creates a false dichotomy in describing categories of immigration statuses post-OBBB as either "Not eligible unless an LPR" or "Not eligible." Regardless of the status they once held, any non-citizen who adjusts to LPR status can become eligible for SNAP if they meet other statutory requirements. However, the Non-Citizen Guidance incorrectly places many of these individuals in the "Not eligible" category, rather than the "Not eligible unless an LPR category."

63.    The Non-Citizen Guidance states—correctly—that several groups of non-citizens are "Not eligible unless an LPR," Non-Citizen Guidance at 5-8, but at the same time misleadingly provides that identically situated groups are categorically "Not eligible" without acknowledging that those groups can become eligible if they adjust to LPR status. In reality, irrespective of someone's immigration status before becoming an LPR, once they obtain their Green Card, they are eligible for SNAP if they meet other statutory requirements.

64.    Specifically, the Non-Citizen Guidance instructs States that individuals from the following categories, which are defined as "Alien Groups" in the Guidance,[3] are ineligible unless they have adjusted status and become an LPR: Certain American Indians Born Abroad, Hmong or

---

[3] This Complaint has adopted the names and definitions for the categories of Alien Groups in Attachment 1 and 2 to the Guidance, unless otherwise noted.

Highland Laotian Tribal Members, Conditional Entrants, Battered Aliens, and Victims of Severe Trafficking and Certain Family Members.

65.     In contrast, the Non-Citizen Guidance provides that individuals from the following categories are categorically "Not eligible": Refugees; Individuals Granted Asylum; Parolees; Deportation Withheld; Certain Afghan Nationals Granted Parole Between July 31, 2021, and September 30, 2023 ("Certain Afghan Parolees"); and Certain Ukrainian Nationals Granted Parole Between February 24, 2022, and September 30, 2024 ("Certain Ukrainian Parolees") (collectively, "Humanitarian Immigrant Groups").

66.     But both groups are similarly situated: they are not eligible unless they adjust status to become an LPR. Even if these individuals must adjust to LPR status to become eligible, it is contrary to law to assert that some groups are ineligible "unless an LPR," while not doing the same for the Humanitarian Immigrant Groups. The use of these two categories indicates, contrary to the post-OBBB FNA, that the Humanitarian Immigrant Groups can *never* become eligible for SNAP.

67.     There is no rational distinction between those individuals categorized by the Non-Citizen Guidance as "Not eligible unless an LPR" and those simply deemed "Not eligible."

68.     Worse, the Non-Citizen Guidance specifically designates many individuals as categorically "Not eligible" who have clear pathways to becoming LPRs. For example, Refugees and Individuals Granted Asylum may adjust status and become LPRs after one year. *See* 8 U.S.C. § 1159(a)(1)(C), (a)(2) (*requiring* that immigrants who are admitted as Refugees "shall" be inspected and examined for admission as LPRs); 8 U.S.C. § 1159(b) (providing that individuals granted asylum may apply to adjust to LPR status after one year of physical presence in the U.S.); 8 C.F.R. §§ 209.1(a), 209.2(a).

***Misapplication of PRWORA's Five-Year Waiting Period***

69.     As detailed above, LPRs are eligible for SNAP when they meet one of PRWORA's exceptions. There are two types of exceptions: the exception that requires a five-year period of residence in the U.S., and exceptions that do not require any waiting period and instead provide immediate eligibility. The Non-Citizen Guidance erroneously instructs States that certain

categories of LPRs are subject to the five-year waiting period when, in reality, they are eligible for SNAP immediately.

70.     The Non-Citizen Guidance—correctly—provides that LPRs are "[e]ligible after a 5-year waiting period, as long as they meet all other SNAP . . . eligibility requirements." The Non-Citizen Guidance—also correctly—provides that LPRs "may still be eligible for SNAP without a waiting period" if they meet certain "conditions."

71.     The problem is that the Non-Citizen Guidance lists some, but not all, of the conditions that render an LPR immediately eligible for SNAP without a five-year waiting period. It omits key categories of Humanitarian Immigrant Groups, like Refugees and Individuals Granted Asylum.

72.     Specifically, the Non-Citizen Guidance provides:

"LPRs may still be eligible for SNAP without a waiting period if they meet one or more of the following conditions:

- Are under 18 years old
- Have 40 qualifying work quarters
- Are blind or disabled
- Were lawfully residing in the U.S. and 65 or older on August 22, 1996
- Have a U.S. military connection
- Are admitted to the United States as an Amerasian immigrant
- Are an American Indian born abroad
- Certain Hmong or Highland Laotian tribal members"

73.     Nowhere does the Non-Citizen Guidance state that the following categories likewise may be eligible for SNAP without a waiting period under PRWORA: LPRs who entered as Refugees, Individuals Granted Asylum, Deportation Withheld, and other groups that Congress has specified have the same eligibility for benefits as Refugees, including Certain Afghan and Ukrainian Parolees, Iraqi and Afghan Special Immigrants (SIV), and Victims of Severe Trafficking (collectively, "Waiting Period Exempt Humanitarian Groups").[4]

---

[4] In a series of Continuing Resolutions, Congress specified that certain Afghan nationals granted humanitarian parole between July 31, 2021, and September 30, 2023, were eligible for benefits to the same extent as Refugees. *See, e.g.*, Section 2502 of the Extending Government Funding and Delivering Emergency Assistance Act, P.L. 117-43. Congress also provided that certain Ukrainian

74.     The PRWORA statute is clear: each of the Waiting Period Exempt Humanitarian Groups are eligible for SNAP without the five-year waiting period. 8 U.S.C. §§ 1612(a)(2)(A)(i) (Refugees), (a)(2)(A)(ii) (Individuals Granted Asylum), (a)(2)(A)(iii) (Deportation Withheld).

75.     USDA's regulations are likewise clear that PRWORA's five-year waiting period does not apply to non-citizens who have had the status of Refugees, Individuals Granted Asylum, and Deportation Withheld. Regulations divide Qualified Aliens into two groups: those who "must be in a qualified status for 5 years before being eligible to receive SNAP benefits," 7 C.F.R. 273.4(a)(6)(iii), and those who are "eligible to receive food stamps and [are] not subject to the requirement to be in qualified status for 5 years," including Refugees, Individuals Granted Asylum, and Deportation Withheld, as well as other categories that the Guidance retains. 7 C.F.R. § 273.4(a)(6)(ii).

76.     Until recently, the USDA's website[5] explained that the Waiting Period Exempt Humanitarian Groups were exempt from the 5-Year Rule:

_____

nationals granted humanitarian parole between February 24, 2022, and September 30, 2024, were eligible for benefits to the same extent as Refugees. Section 401 of the Additional Ukraine Supplemental Appropriations Act, 2022, P.L. 117-128. Similarly, Congress directed that Iraqi and Afghani Special Immigrant Visa Holders were to be treated as refugees, for benefits eligibility purposes. Section 8120 of the Department of Defense Appropriations Act of 2010, P.L. 111-118. And victims of severe trafficking are also eligible for benefits "to the same extent as an alien who is admitted to the United States as a refugee," "[n]otwithstanding title IV of the Personal Responsibility and Work Opportunity and Reconciliation Act of 1996." 22 U.S.C. § 7105(b)(1)(A).
[5] U.S. Dep't of Agric. Food & Nutrition Serv., *SNAP Eligibility for Non-Citizens*, https://web.archive.org/web/20250718231851/https://www.fns.usda.gov/snap/recipient/eligibility/non-citizen. As of January 28, 2026, the website currently states, "We are in the process of updating this page with the changes made by the One Big Beautiful Bill Act of 2025."

| Eligible Non-citizen Groups | Eligibility Status |
|---|---|
| • Refugees<br>• Individuals granted asylum<br>• Victims of severe trafficking<br>• Deportation withheld<br>• Amerasians<br>• Cuban and Haitian entrants<br>• Iraqi and Afghan special immigrants (SIV)<br>• Certain American Indians born abroad<br>• Hmong or Highland Laotian tribal members<br>• Compacts of Free Association (COFA) citizens of the Federated States of Micronesia, the Republic of the Marshall Islands, and the Republic of Palau | Eligible immediately, with no waiting period, as long as they meet all other SNAP financial and non-financial eligibility requirements. |
| • Lawful permanent residents (LPR) or Green Card holders<br>• Those granted parole for a period of at least one year<br>• Conditional entrants<br>• Battered non-citizens | Eligible after a 5-year waiting period, as long as they meet all other SNAP financial and non-financial eligibility requirements.<br><br>Individuals in one of these groups may still be eligible for SNAP without a waiting period if they:<br><br>• Are a child under 18 years old<br>• Are blind or disabled and receiving benefits for assistance for your condition<br>• Were lawfully residing in the U.S. and 65 or older on Aug. 22, 1996<br>• Have a U.S. Military connection<br>• Are an Afghan granted parole<br>• Are a Ukrainian granted parole |
| • Children under age 18 in any of the above groups in this table | Eligible immediately, with no waiting period, as long as they meet all other SNAP financial and non-financial eligibility requirements. |

***Misinterpretation of the 120-Day Exclusionary Period for Payment Error Rate Calculations***

77.     The Non-Citizen Guidance addressing non-citizen SNAP eligibility was issued on Friday, October 31, 2025, 119 days after the OBBB went into effect.

78.     The Non-Citizen Guidance states that "FNS will . . . hold States harmless for Quality Control (QC) purposes for 120 days from the required implementation date in accordance with 7 CFR 275.12(d)(2)(vii)." Non-Citizen Guidance at 3. The Guidance goes on to say, "A 120-day variance exclusion is permitted for the misapplication of changes in Section 10108 of the OBBB to new and ongoing SNAP households until the exclusionary period end date on November 1, 2025." Non-Citizen Guidance at 4.

79.     In other words, the Non-Citizen Guidance started the clock of the 120-day exclusionary period on July 4, 2025, the date that OBBB went into effect, and ended it one day after issuing the implementing Guidance.

80.     Federal regulations provide for a "120-day exclusionary period" covering the "application of a new Program regulation or implementing memorandum of a mandatory or optional change in Federal law," so that errors during that period do not count towards the error

rate. 7 C.F.R. § 275.12(d)(2)(vii). The implementing memorandum sets forth the required implementation date and the changes that States must apply to their SNAP programs.

81.     This regulation is clear: the starting point for the regulatory exclusionary period is the "required implementation date" of either a new regulation or an "implementing memorandum." 7 C.F.R. § 275.12(d)(2)(vii). In other words: the required implementation date cannot come before the implementing memorandum. Prior to August 2025, agency practice conformed to the regulations, and FNS set the "required implementation date" after (often weeks or even months after) the issuance of the implementing memorandum.

82.     Thus, the 120-day exclusionary period for the Non-Citizen Guidance could *start* no earlier than October 31, 2025, the date that the implementing Non-Citizen Guidance was issued, and end no earlier than 120 days later.

83.     The SNAP statute confirms that the exclusionary period does not run from the effective date of a new statute, but rather from the effective date of the agency action. 7 U.S.C. § 2025(c)(3)(A).

***State Response to USDA Guidance***

84.     On November 19, 2025, 21 Plaintiff States wrote to USDA, requesting that the agency withdraw the Non-Citizen Guidance. The November 19 letter, a copy of which is attached hereto as ***Exhibit B***, outlined the legal errors contained in the Non-Citizen Guidance and asked USDA to rescind the Non-Citizen Guidance and reissue a corrected guidance memorandum. The States requested a response by Monday, November 24, 2025.

85.     USDA did not respond to Plaintiff States' letter.

**E.     USDA Issues Guidance Providing Substantive Instructions on Implementing OBBB Sections 10102 and 10103 and Changing Its Interpretation of 120-Day Exclusionary Rule**

86.     On August 29, 2025, USDA issued a guidance memorandum to SNAP State agencies (the "SUA Guidance"), to provide them "with additional information on implementing Section 10103 of the OBBB, which changes the treatment of certain energy assistance payments for SNAP." A copy of the SUA Guidance is appended hereto as ***Exhibit D***.

Page 18 - FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

87.     In a section entitled, "Quality Control and Technical Assistance," the agency announced that although "[a] 120-day variance exclusion is permitted," the period had already begun to run and would end 64 days after the guidance issuance date, on November 1, 2025.

88.     But as noted above, the minimum starting point for the exclusionary period is the "required implementation date" of either a new regulation or an "implementing memorandum." The exclusionary period for the SUA Guidance should therefore not have begun before August 29, 2025.

89.     A week later, on September 4, 2025, USDA issued the Information Memo (***Exhibit C***) outlining the "SNAP Provisions of the One Big Beautiful Bill Act of 2025."  The Information Memo did not directly address the 120-day exclusionary period, except to say that "FNS will, as appropriate, hold states harmless for Quality Control (QC) purposes for 120 days from the implementation date."

90.     As to Section 10102 (ABAWDs), the Information Memo says, "These changes were effective upon enactment. State agencies must apply updated exceptions to new and ongoing participants after they are screened."  And as to Section 10103 (SUA), the memo says, "This provision is effective upon enactment."

91.     On October 3, 2025, USDA-FNS issued a guidance memorandum to SNAP State Agencies (the "ABAWD Guidance"), to provide them "with additional information on implementing Section 10102(a) of the OBBB, which changes exceptions from the Able-Bodied Adults Without Dependents (AWAWD) time limit." A copy of the ABAWD Guidance is appended hereto as ***Exhibit E***.

92.     In a section entitled, "Quality Control and Technical Assistance," the agency announced that although "[a] 120-day variance exclusion is permitted," the period had already begun to run and would end 29 days after the guidance issuance date, on November 1, 2025.

93.     However, again, the exclusionary period should have begun no earlier than the "required implementation date" of the "implementing memorandum." The exclusionary period for the ABAWD Guidance should therefore not have begun before October 3, 2025.

94.     On November 14, 2025, USDA issued a policy memo (the "Exclusionary Period Memo") answering "follow-up questions submitted by State agencies on the variance exclusion period for implementation" of Sections 10102 and 10103 of the OBBB. A copy of the Exclusionary Period Memo is attached hereto as ***Exhibit F***.

95.     The Exclusionary Period Memo reiterated that the "required implementation date" for both Sections 10102 and 10103 of the OBBB was "the enactment of OBBB, July 4, 2025" and therefore the exclusionary period had already ended 14 days prior.

**F.      Facing this Lawsuit, USDA Concedes Errors in October 31 Non-Citizen Guidance**

96.     On November 26, 2025, Plaintiff States brought this lawsuit, seeking preliminary injunctive relief.

97.     On December 9, 2025, USDA released a new document titled "Supplemental Nutrition Assistance Program (SNAP) Provisions of the One Big Beautiful Bill—Alien SNAP Eligibility—Question and Answer #1" (the "Original Non-Citizen Q&A"), which "provides additional information on Section 10108 of the OBBB." A copy of the Original Non-Citizen Q&A is attached hereto as ***Exhibit G.***

98.     A day later, on December 10, the USDA-FNA released a revised version of the memo (the "Non-Citizen Q&A"), a copy of which is attached hereto as ***Exhibit H.***

99.     In the Non-Citizen Q&A, the USDA conceded that all non-citizens who adjust to lawful permanent resident status can become eligible for SNAP if they meet other statutory requirements and that the Waiting Period Exempt Humanitarian Groups can all become eligible for SNAP as soon as they adjust to LPR status, without any waiting period.

**G.      Plaintiff States Have Been Harmed and Will Continue to Be Harmed by the Non-Citizen Guidance and by USDA's Interpretation of the 120-Day Exclusionary Rule**

100.    The Non-Citizen Guidance caused significant confusion for the States, which were asked to implement new substantive, erroneous limitations on SNAP eligibility, many of which could not have been anticipated as they diverge from the text of the OBBB, in 24 hours.

101.    On December 15, 2025, this Court enjoined the Non-Citizen Guidance, extending the exclusionary period for application of the guidance's non-citizen eligibility rules until April 9, 2026. The Court's preliminary injunction and the Non-Citizen Q&A averted many harms related to the Non-Citizen Guidance that would have occurred otherwise.

102.    However, prior to the Court's action, many Plaintiff States faced significant costs in complying with the Non-Citizen Guidance, which contradicts the non-citizen eligibility requirements in the FNA as amended by the OBBB and PRWORA. While Plaintiff States were waiting nearly four months for USDA to issue the implementing Non-Citizen Guidance, many States invested significant time and resources into modifying their SNAP benefits systems and procedures in accordance with the OBBB's eligibility changes. The Non-Citizen Guidance required States that had already begun to implement the changes to re-do and revise some of that work and make additional changes, including, for example, re-programming their computer systems, revising their intake procedures, and re-training staff. This resulted in increased administrative costs and placed a burden on Plaintiff States' benefits agencies.

103.    Some Plaintiff States, which provide state-funded food benefits to individuals who are not eligible for SNAP, would have faced significant out of pocket costs to provide State benefits to non-citizens whom the Non-Citizen Guidance indicates are ineligible for SNAP.

104.    Plaintiff States are also harmed by the Defendants' erroneous interpretations of the 120-day exclusionary rule in the SUA Guidance, the ABAWD Guidance, the Non-Citizen Guidance, and the Exclusionary Period Memo. Plaintiff States face a likelihood of an increase in errors as they struggle to reconcile their obligations under federal statutes, especially in light of the legally erroneous Non-Citizen Guidance.

105.    The consequences of an increased payment error rate could be financially ruinous for Plaintiff States in light of the "State Quality Control Incentive" provision of the OBBB which uses the payment error rate to measure penalties for States.

## CAUSES OF ACTION
### Count I
### Violation of the Administrative Procedure Act
### Contrary to Law – Non-Citizen Eligibility

106.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

107.    USDA is an "agency" under the APA. 5 U.S.C. § 551(1).

108.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)–(C).

109.    The Non-Citizen Guidance was a final agency action, because it marked "the consummation" of agency decision making and determined "'rights or obligations' . . . from which 'legal consequences'" flowed. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

110.    The Non-Citizen Guidance is contrary to law, including in, but not limited to the following ways.

111.    *First*, the Non-Citizen Guidance erroneously excludes Refugees, Individuals Granted Asylum, Parolees, and other Humanitarian Immigrant Groups from the categories of non-citizens who may eventually become eligible for SNAP benefits, even if they adjust status to become LPRs. But federal law provides that these groups *are* eligible for SNAP benefits so long as they have adjusted status to LPR. Nothing in 7 U.S.C. § 2015(f), as modified by the OBBB, or in PRWORA, excludes these categories of non-citizens from SNAP.

112.    *Second*, the Non-Citizen Guidance erroneously directs that individuals who entered the United States as Waiting Period Exempt Humanitarian Groups are subject to PRWORA's five-year waiting period for SNAP benefits after adjusting to LPR status. But PRWORA excludes the Waiting Period Exempt Humanitarian Groups from the five-year waiting period. And no provision of the OBBB amended PRWORA's exemptions from its five-year waiting period.

113.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Non-Citizen Guidance is contrary to law in violation of the APA.

114.    Plaintiff States are also entitled to vacatur of the Non-Citizen Guidance and a preliminary and permanent injunction preventing Defendants from implementing the Non-Citizen Guidance.

### Count II
### Violation of The Administrative Procedure Act
### Arbitrary & Capricious – Non-Citizen Eligibility

115.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

116.    USDA is an "agency" under the APA. 5 U.S.C. § 551(1).

117.    The Non-Citizen Guidance is a final agency action under the APA.

118.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

119.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

120.    That "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and [decisionmaking] process." *Id.*

121.    An action is also arbitrary and capricious if the agency "'failed to consider . . . important aspect[s] of the problem' before" it. *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

122.　In addition, when an agency "rescinds a prior policy," the agency must, at minimum, "consider the 'alternatives' that are within the ambit of the existing policy," "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Id.* at 3, 33.

123.　"It is a bedrock principle of administrative law that an agency must treat like cases alike." *Univ. of Texas M.D. Anderson Cancer Ctr. v. United States Dep't of Health & Hum. Servs.,* 985 F.3d 472, 479 (5th Cir. 2021). "Unexplained inconsistency is . . . a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act." *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 981 (2005).

124.　The Non-Citizen Guidance is arbitrary and capricious because the Defendants failed to provide a reasoned explanation for why some groups were labeled "Not eligible" for SNAP benefits and others were labeled "Not eligible unless an LPR."

125.　The Non-Citizen Guidance is arbitrary and capricious because the Defendants failed to provide a reasoned explanation for why the agency was changing its position as to whether the Waiting Period Exempt Humanitarian Groups were subject to the five-year waiting period. The fact that the Non-Citizen Guidance maintained some non-citizen statuses as exempt from the five-year waiting period but omitted others equally exempt under the law is additionally arbitrary and capricious because it lacks any rational reason or explanation.

126.　The Non-Citizen Guidance is arbitrary and capricious because it fails to consider important aspects of the problem, including the cost to States in implementing a misleading and unlawful policy, and whether the Non-Citizen Guidance would consequently increase States' payment error rates.

127.　The Non-Citizen Guidance is arbitrary and capricious because it fails to take into account important reliance interests.

128.　Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Non-Citizen Guidance violates the APA because it is arbitrary and capricious.

129.    Plaintiff States are also entitled to vacatur of the Non-Citizen Guidance pursuant to 5 U.S.C. § 706, and a preliminary and permanent injunction preventing implementation of the Non-Citizen Guidance.

### Count III
### Violation of the Administrative Procedure Act
### Contrary to Law – Exclusionary Period

130.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

131.    USDA is an "agency" under the APA. 5 U.S.C. § 551(1).

132.    The SUA Guidance, the ABAWD Guidance, the Non-Citizen Guidance, and the Exclusionary Period Memo are each final agency actions.

133.    The SUA Guidance, the ABAWD Guidance, the Non-Citizen Guidance, and the Exclusionary Period Memo are contrary to law in that they erroneously state that the 120-day exclusionary period for the calculation of States' error payment rates began on the day that the OBBB became effective. But USDA did not issue any guidance implementing OBBB Section 10103's changes to SUA calculation until August 29, 2025, OBBB Section 10102's changes to ABAWD eligibility until October 3, 2025, and OBBB Section 10108's changes to non-citizen eligibility until October 31, 2025. USDA's own regulations provide that the 120-day exclusionary period begins with the issuance of the implementing memoranda. 7 C.F.R. § 275.12(d)(2)(vii).

134.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the implementation date and the exclusionary period of Sections 10102, 10103, and 10108 of the OBBB, as stated in the SUA Guidance, the ABAWD Guidance, the Non-Citizen Guidance, and the Exclusionary Period Memo are contrary to law in violation of the APA.

135.    Plaintiff States are also entitled to stay and preliminary injunction of the implementation date and exclusionary period of the Non-Citizen Guidance and of OBBB Section 10108's changes to non-citizen eligibility with respect to the calculation of Plaintiff States' error rates.

136.    Plaintiff States are also entitled to a permanent injunction enjoining the implementation date and exclusionary period of Sections 10102, 10103, and 10108 of the OBBB, as declared in the SUA Guidance, the ABAWD Guidance, the Non-Citizen Guidance, and the Exclusionary Period Memo, with respect to the calculation of Plaintiff States' error rates.

**Count IV**
**Violation of The Administrative Procedure Act**
**Arbitrary & Capricious – Exclusionary Period**

137.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

138.    USDA is an "agency" under the APA. 5 U.S.C. § 551(1).

139.    The SUA Guidance, the ABAWD Guidance, the Non-Citizen Guidance, and the Exclusionary Period Memo are each final agency actions under the APA.

140.    The Non-Citizen Guidance is arbitrary and capricious because USDA waited nearly four months to issue the Guidance, then erroneously determined that the error-rate exclusionary period had begun nearly four months earlier and ended the next day. Similarly, the SUA Guidance is arbitrary and capricious because USDA waited nearly two months to issue the Guidance and then erroneously determined that the error-rate exclusionary period had already been running for two months. The ABAWD Guidance is likewise arbitrary and capricious because USDA waited nearly three months to issue the Guidance and then erroneously determined that the error-rate exclusionary period had already been running for three months. Finally, the Exclusionary Period Memo is arbitrary and capricious because it was issued *after* the end of the exclusionary period.

141.    There is no indication in the SUA Guidance, the ABAWD Guidance, the Non-Citizen Guidance, and the Exclusionary Period Memo that the agency considered the effects that these actions would have on States, including on States' payment error rates, or that it took into account States' reliance interests.

142.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the implementation date and the exclusionary period of Sections 10102, 10103, and 10108 of the OBBB, as declared by the SUA Guidance, the ABAWD Guidance, the Non-

Citizen Guidance, and the Exclusionary Period Memo are arbitrary and capricious in violation of the APA.

143.    Plaintiff States are also entitled to stay and preliminary injunction of the implementation date and exclusionary period of the Non-Citizen Guidance and of OBBB Section 10108's changes to non-citizen eligibility with respect to the calculation of Plaintiff States' error rates.

144.    Plaintiff States are also entitled to a permanent injunction enjoining the implementation date and exclusionary period of Sections 10102, 10103, and 10108 of the OBBB, as declared in the SUA Guidance, the ABAWD Guidance, the Non-Citizen Guidance, and the Exclusionary Period Memo with respect to the calculation of Plaintiff States' error rates.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff States pray that this Court:

i.    Issue a judicial declaration that the SUA Guidance, the ABAWD Guidance, the Non-Citizen Guidance, and the Exclusionary Period Memo are contrary to law and arbitrary and capricious, in violation of the Administrative Procedure Act;

ii.    Pursuant to 5 U.S.C. § 705, stay the Non-Citizen Guidance;

iii.    Pursuant to 5 U.S.C. § 706, vacate the SUA Guidance, the ABAWD Guidance, the Non-Citizen Guidance, the Exclusionary Period Memo, and any other communications regarding the required implementation date consistent with those memoranda, with respect to the calculation of Plaintiff States' error rates;

iv.    Preliminarily and permanently enjoin Defendants from implementing the Non-Citizen Guidance's eligibility provisions and the required implementation date of Section 10108 of the OBBB, as declared in the Non-Citizen Guidance;

v.    Permanently enjoin the required implementation date of Sections 10102, 10103, and 10108 of the OBBB, as declared in the SUA Guidance, the ABAWD Guidance, the Non-Citizen Guidance, the Exclusionary Period Memo, and any other

communications regarding the implementation date consistent with those memoranda, with respect to the calculation of Plaintiff States' error rates;

vi.   Award the Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

vii.  Grant other such relief as this Court may deem proper.

Dated: January 30, 2026                          Respectfully submitted,

**LETITIA JAMES**
Attorney General for the State of New York

By: _s/ Molly Thomas-Jensen_
Molly Thomas-Jensen
Jessica Ranucci
_Special Counsel_
Rabia Muqaddam
_Chief Counsel for Federal Initiatives_
Gina Bull
_Assistant Attorney General_
28 Liberty St.
New York, NY 10005
(212) 416-8679
molly.thomas-jensen@ag.ny.gov
jessica.ranucci@ag.ny.gov
rabia.muqaddam@ag.ny.gov
gina.bull@ag.ny.gov


_Counsel for the State of New York_

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: _s/ Leanne Hartmann_
Leanne Hartmann #257503
Brian Simmonds Marshall #196129
Kirsten Naito # 114684
_Senior Assistant Attorneys General_
Sara Del Rubin #232414
Derek Olson #225504
_Assistant Attorneys General_
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Leanne.Hartmann@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov
Kirsten.M.Naito@doj.oregon.gov
Sara.DelRubin@doj.oregon.gov
Derek.Olson@doj.oregon.gov

_Counsel for the State of Oregon_

**ROB BONTA**
Attorney General for the State of California

By: *s/ Robin L. Goldfaden*
Robin L. Goldfaden
*Supervising Deputy Attorney General*
Michael L. Newman
Neli N. Palma
*Senior Assistant Attorneys General*
Marissa Malouff
Kathleen Boergers
*Supervising Deputy Attorneys General*
California Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3543
Robin.Goldfaden@doj.ca.gov

*Counsel for the State of California*

**WILLIAM TONG**
Attorney General of Connecticut

By: *s/ Patricia E. McCooey*
Patricia E. McCooey
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5210
Patricia.McCooey@ct.gov

*Counsel for Plaintiff State of Connecticut*

**PHILIP J. WEISER**
Attorney General of Colorado

By: *s/ Tanja E. Wheeler*
Tanja E. Wheeler
*Associate Chief Deputy Attorney General*
David Moskowitz
*Deputy Solicitor General*
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
Tanja.wheeler@coag.gov
David.moskowitz@coag.gov

*Counsel for Plaintiff State of Colorado*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: *s/ Vanessa L. Kassab*
Ian R. Liston
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Rose E. Gibson
*Assistant Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for Plaintiff State of Delaware*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: *s/ Mitchell P. Reich*
Mitchell P. Reich
*Senior Counsel to the Attorney General*
Office of the Attorney General for the District
of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

*Counsel for the District of Columbia*

**KWAME RAOUL**
Attorney General of Illinois

By: *s/ Katharine Roller*
Katharine Roller
*Complex Litigation Counsel*
Alice L. Riechers
*Assistant Attorney General*
115 S. LaSalle St.,
Chicago, Illinois 60603
(773) 519-1842
Katharine.Roller@ilag.gov

*Counsel for Plaintiff State of Illinois*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: *s/ Kalikoʻonālani D. Fernandes*
David D. Day
*Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**AARON M. FREY**
Attorney General for the State of Maine

By: *s/ Brendan Kreckel*
Brendan Kreckel
By: */s/ Kristin Trabucchi*
Kristin Trabucchi
*Assistant Attorneys General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel.: 207-626-8800
Fax: 207-287-3145
Brendan.kreckel@maine.gov
kristin.k.trabucchi@maine.gov

*Counsel for the State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

By: *s/ Yasmin Dagne*
Yasmin Dagne
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-223-1580
ydagne@oag.state.md.us

*Counsel for Plaintiff State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: *s/ Michelle Pascucci*
Katherine Dirks
*Chief State Trial Counsel*
Michelle Pascucci
*State Trial Counsel*
Jak Kundl
*Assistant Attorney General*
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2255
Michelle.Pascucci@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

By: *s/ Daniel Ping*
Daniel Ping
Neil Giovanatti
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
PingD@michigan.gov
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: *s/ Joseph R. Richie*
Joseph R. Richie
*Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us

*Counsel for the State of Minnesota*

**AARON D. FORD**
Attorney General of Nevada

By: *s/ K. Brunetti Ireland*
K. Brunetti Ireland
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov


*Counsel for the State of Nevada*


**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: *s/ Kashif T. Chand*
Kashif T. Chand
*Assistant Attorney General*
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
Kashif.Chand@law.njoag.gov

*Counsel for Plaintiff State of New Jersey*


**RAÙL TORREZ**
Attorney General of the State of New Mexico

By: *s/ Lauren Perry*
Lauren Perry
*Assistant Attorney General*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
505-270-4332
lperry@nmdoj.gov


*Counsel for the State of New Mexico*


**JEFF JACKSON**
Attorney General of North Carolina

By: *s/ Daniel P. Mosteller*
Daniel P. Mosteller
*Associate Deputy Attorney General*
Laura Howard
*Chief Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

*Counsel for the State of North Carolina*


**PETER F. NERONHA**
Attorney General of Rhode Island

By: *s/ Marissa D. Pizaña*
Marissa D. Pizaña
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
MPizana@riag.ri.gov

*Counsel for the State of Rhode Island*


**CHARITY R. CLARK**
Attorney General of Vermont

By: *s/ Ryan P. Kane*
Ryan P. Kane
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

*Counsel for Plaintiff State of Vermont*


Page 32 - FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**JAY JONES**
Attorney General of the Commonwealth of
Virginia

By: *s/ Tillman J. Breckenridge*
Tillman J. Breckenridge
*Solicitor General*
Mikaela A. Phillips
*Assistant Solicitor General*
Office of the Attorney General
202 N. 9th Street
Richmond, Virginia 23219
Tel: (804) 786-7704
solicitorgeneral@oag.state.va.us
mphillips@oag.state.va.us

*Counsel for Plaintiff The Commonwealth of
Virginia*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: *s/ Karla Z. Keckhaver*
Karla Z. Keckhaver
*Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-6365
karla.keckhaver@wisdoj.gov

*Counsel for Plaintiff State of Wisconsin*

**NICHOLAS W. BROWN**
Attorney General of Washington

By: *s/ William McGinty*
William McGinty
Niya Tawachi
*Assistant Attorneys General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
william.mcginty@atg.wa.gov
niya.tawachi@atg.wa.gov

*Counsel for Plaintiff State of Washington*