LETITIA JAMES
Attorney General for the State of New York
Molly Thomas-Jensen
Jessica Ranucci
*Special Counsel*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Gina Bull
*Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8679
Email: molly.thomas-jensen@ag.ny.gov
       jessica.ranucci@ag.ny.gov
       rabia.muqaddam@ag.ny.gov
       gina.bull@ag.ny.gov


Attorneys for the State of New York

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| STATE OF NEW YORK, et al., | Case No.  6:25-cv-02186-MTK |
| Plaintiffs, | DECLARATION OF GLORIA BROWN BURNETT |
| v. | |
| BROOKE ROLLINS, in her official capacity as Secretary of the U.S. Department of Agriculture, et al., | |
| Defendants. | |

Page 1 -   DECLARATION OF GLORIA BROWN BURNETT

I, Gloria Brown Burnett, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of the State of Maryland, and I am over the age of 18. I am competent to testify as to the matters herein.

2. I am the interim Secretary at the Maryland Department of Human Services (MDHS), which contains the Family Investment Administration, the state agency responsible for administering the federal Supplemental Nutrition Assistance Program (SNAP). I am a cabinet-level official appointed by the Governor on February 23, 2026 in an acting capacity to serve through March 31, 2026, and responsible for leading the state's primary social service agency. In this role, I direct the MDHS major program administrations, including Family Investment, Child Support, and Social Services. These duties involve overseeing programs offering economic assistance, child and adult protective services, and the child welfare system, while managing a workforce of almost 6,000 employees and coordinating with local departments of social services to serve over 1 million Marylanders annually.

3. I make this declaration based on my personal knowledge, on information I acquired through the performance of my duties at MDHS, and on my review of records maintained in the ordinary course of business by MDHS. If called as a witness, I could and would testify competently to the matters set forth below.

PUBLIC LAW 119-21 (THE ONE BIG BEAUTIFUL BILL ACT OF 2025)

4. On July 4, 2025, President Donald J. Trump signed into law Public Law 119-21, the One Big Beautiful Bill Act of 2025 (H.R 1).

Page 2 -    DECLARATION OF GLORIA BROWN BURNETT

5. H.R. 1 made many changes to the administration of the SNAP program. It also changed the structure of how SNAP benefits and administration will be paid for in the future between states and the federal government, shifting more of the expense of the program onto states.

6. Specifically, Section 10108 of H.R. 1, titled "Alien SNAP Eligibility," made changes to the eligibility of certain categories of non-citizens for SNAP benefits, amending section 6(f) of the Food and Nutrition Act of 2008, 7 U.S.C. 2015(f).

7. Section 10103 of H.R. 1, titled, "Availability of Standard Utility Allowances Based on Receipt of Energy Assistance," limited which households would qualify for an income deduction based on receipt of energy assistance payments. Previously, households who received payments through qualifying energy assistance programs also received a deduction from their household income, the heating and cooling standard utility allowance. H.R. 1 changed that allowance to only apply to households that contain an elderly or disabled member.

8. Section 10102 of H.R. 1, titled "Modification to SNAP Work Requirements for Able-Bodied Adults," changes who can be excepted from the rule that Able-Bodied Adults Without Dependents (ABAWDs) may not receive SNAP benefits for more than three months in a three-year period without also meeting ABAWD work requirements, including working, volunteering, or participating in a job skills program a set number of hours per week. The law narrowed the categories of people who are exempt from the ABAWD work requirements, including removing exemptions for homeless individuals, veterans, individuals aged 24 or younger who aged out of foster care, individuals aged 54 to 59, and households with children aged 14 to 17. The law also created new exceptions

Page 3 -   DECLARATION OF GLORIA BROWN BURNETT

to the ABAWD work requirements for certain Native Americans. Section 10102 also narrowed the criteria under which States can apply for and be granted a waiver from the ABAWD time limits.

9. Section 10105 of H.R. 1 created a new set of penalties for States tied to their payment error rates.

10. MDHS typically relies on USDA guidance to implement statutory changes to SNAP to ensure we are complying with the agency's interpretation of the law. In recognition that States need time to fully implement new changes to their SNAP programs correctly, the SNAP statute and regulations provide a 120-day period during which State payment errors are waived for the purpose of calculating their payment error rate, called the "exclusionary period."

11. In the past, the agency began the exclusionary period *after* USDA issued its implementing guidance to the States, providing States at least 120 days after receiving guidance to enact program changes, in line with the SNAP statute and regulations.

12. However, the guidance documents (together, the "Guidance Documents") that USDA issued regarding Sections 10102, 10103, and 10105 of H.R. 1 informed States that the exclusionary period for implementing these program changes had started running on July 4, 2025—the day that H.R. 1 was enacted—even though the Guidance Documents came long after that date.

13. On August 29, 2025, USDA issued guidance about Section 10103 of H.R. 1, which changed how the standard utility allowance is calculated in determining SNAP benefit amounts, stating that the exclusionary period ended November 1. On October 3, 2025, USDA issued guidance about Section 10102(a) of H.R. 1, which changed the exceptions

Page 4 -    DECLARATION OF GLORIA BROWN BURNETT

from work requirements for able-bodied adults without dependents, or ABAWDs, stating that the exclusionary period ended November 1. And on October 31, 2025, USDA issued guidance on non-citizen eligibility, informing States the exclusionary period would end the very next day, November 1, 2025 (a Saturday).

14. Historically, MDHS experiences more errors as we figure out how to implement new guidance. Thus, USDA may attempt to count any so-called "errors" stemming from the Guidance Documents as part of Maryland's payment error rate, increasing the risk that Maryland may have to pay financially ruinous penalties.

15. In the past, USDA's Food and Nutrition Service (FNS or USDA-FNS)'s practice has been to begin the exclusionary period after the issuance of agency guidance. It is my understanding that it is impractical for states to update their systems prior to guidance, and nearly impossible to change these systems overnight. This is the case for MDHS—it is impractical to update our systems prior to receiving guidance and nearly impossible to change our systems overnight.

16. For example, on February 7, 2014, SNAP was reauthorized as part of The Agricultural Act of 2014 (P.L. 113-79). FNS sent implementing guidance to states on March 5, 2014. On May 8, 2014, FNS sent clarifying Quality Control (QC) answers that indicated the 120-QC hold harmless period applied to variances began on March 10, 2014 through July 8, 2014. This corresponds with the date the implementation guidance was issued and not the date the authorizing law was passed.

17. Based on guidance previously issued by FNS, MDHS did not and could not have expected guidance issued with an immediate implementation date or an implementation date prior to the guidance issuance date.

Page 5 -   DECLARATION OF GLORIA BROWN BURNETT

**USDA GUIDANCE TO H.R. 1 CHANGES TO SNAP PROGRAM**

A.    **USDA's August 29 Guidance Memorandum Pertaining to Standard Utility Allowances**

18. On August 29, 2025, USDA issued a guidance memorandum to SNAP State agencies (the "SUA Guidance"), to provide them "with additional information on implementing Section 10103 of H.R. 1, which changes the treatment of certain energy assistance payments for SNAP."

19. In a section entitled, "Quality Control and Technical Assistance," the agency announced that although "[a] 120-day variance exclusion is permitted," the period had already begun to run and would end 64 days after the guidance issuance date, on November 1, 2025.

20. A week later, on September 4, 2025, USDA issued an Information Memo outlining the "SNAP Provisions of the One Big Beautiful Bill Act of 2025." The Information Memo did not directly address the 120-day exclusionary period, except to say that "FNS will, as appropriate, hold states harmless for Quality Control (QC) purposes for 120 days from the implementation date." As to Section 10103 (SUA), the memo says, "This provision is effective upon enactment."

21. On August 29, 2025, USDA sent MDHS the SUA Guidance via e-mail. Before then, on August 15, 2025, FNS provided States with instructions for calculating Fiscal Year 2026 SUA values which included immediate effectiveness of the restriction on including internet costs in SUA.

22. Prior to H.R. 1, MDHS used a "heat and eat" provision, allowable under Federal law, to confer the SUA on households based on the provision of at least $21 per year in energy assistance through the Low-Income Home Energy Assistance Program and similar state-funded programs. The new requirements in H.R. 1 eliminate the ability of DHS to

Page 6 -    DECLARATION OF GLORIA BROWN BURNETT

confer the SUA based on the receipt of energy assistance except for households with an elderly or disabled member. Therefore, the SUA is now only available to most households if they can provide proof of utility expenses incurred, such as through a utility bill for their address in their name. This requires a significant overhaul of state systems, processes, and training. Maryland's Enrollment & Eligibility (E&E) system needed to be modified to differentiate between households with an elderly or disabled member and those without, and to prompt for verification of utility expenses for non-elderly, non-disabled households. This also requires significant caseworker training and customer outreach, as both caseworkers and customers are unfamiliar with having to ask for, or provide, utility expense verification.

23. In July 2025, following the passage of H.R. 1, MDHS began to take steps to implement H.R.1's changes to SUA calculations as applied to SNAP. These included the following initial internal action and system assessment:

   a. **Initial HLE Request:** MDHS initiated a  High-Level Estimate (HLE) and a data request for HLE system updates to adjust SUA requirements as early as July 3, 2025, following the passage of H.R.1.

   b. **Data Analysis:** MDHS obtained data confirming the number of households that would lose SUA due to the new requirements.

24. After the SUA Guidance was issued, MDHS held internal discussions regarding the interpretation of the guidance, particularly on the heat-and-eat linkage issue and other policy clarifications.

Page 7 -    DECLARATION OF GLORIA BROWN BURNETT

25. On September 19, 2025, MDHS sent clarifying questions to FNS Mid Atlantic Regional Office (MARO). FNS did not answer one of the questions MDHS asked but later addressed the topic in subsequent guidance, which delayed system development.

26. MDHS also took the following steps after the SUA Guidance was issued:

   a. **When MDHS Issued Guidance (Information Session):** On October 9, 2025, MDHS held an H.R.1 Information Session, detailing the policy and system changes.

   b. **Issuance of Action Transmittal:** On October 16, 2025, MDHS issued an Action Transmittal (AT 26-08) on SNAP Treatment of Energy Assistance Payments for October 2025, reflecting updated policy, with an Effective Date of November 1, 2025.

   c. **Training Updates:** On October 24, 2025, policy trainers were sent updates to caseworker slide presentations and refresher presentations to reflect the H.R.1 changes.

27. As described above, MDHS has already invested significant time and resources into planning and implementing the changes to SNAP eligibility made by H.R. 1. The SUA Guidance increased the costs required to implement the changes required by H.R. 1 by shortening the time states had to fully implement the changes and eliminate errors that inevitably result with program changes. Specifically, we had to quickly reprogram Maryland's E&E system and provide training to caseworkers and customers. Without sufficient time to understand the new system requirements, errors will occur, overstating Maryland's Payment Error Rate (PER) and increasing the penalties that will result.

Page 8 -    DECLARATION OF GLORIA BROWN BURNETT

28. The SUA Guidance elevates the risk that Maryland will face massive financial penalties due to inadvertent noncompliance with H.R. 1 and/or the Guidance. As noted above, Section 10105 of H.R. 1 created a new set of penalties for States tied to their payment error rates. The SUA Guidance stated that the exclusionary period—that is, the period of time during which errors do not count towards a state's error rate— ended on November 1, 2025. Historically, there are more errors as MDHS figures out how to implement new guidance. Thus, USDA may attempt to count any so-called "errors" stemming from the SUA Guidance as part of Maryland's payment error rate, increasing the risk that Maryland may have to pay financially ruinous penalties. And USDA claims the authority to count those errors starting November 1, 2025, drastically shortening the period for full compliance, further increasing the chance the errors will be subject to these penalties.

29. As explained above, the actions required to implement H.R.1 changes require significantly more verification for caseworkers in order to grant the SUA to most households. In Federal Fiscal Year 2024, SUA screening accounted for approximately .03 percentage points of Maryland's current PER. DHS has partnered with an outside group, the U.S. Digital Response, and others to assess strategies for reducing our PER, and SUA screening is an area where MDHS is focusing. Because of the significant burden caused by additional SUA verification and the need to reform our screening and verification processes, the shortened compliance time will likely lead to increased payment errors that will increase the likelihood of ruinous financial penalties. MDHS is committed to making progress reducing payment errors related to SUA, but the shortened compliance time will penalize MDHS before it has a chance to make progress.

Page 9 -    DECLARATION OF GLORIA BROWN BURNETT

**B.**     **USDA's October 3 Guidance Related to Able-Bodied Adults Without Disabilities**

30. On October 3, 2025, USDA-FNS issued a guidance memorandum to SNAP State Agencies (the "ABAWD Guidance"), to provide them "with additional information on implementing Section 10102(a) of H.R. 1, which changes exceptions from the Able-Bodied Adults Without Dependents (ABAWD) time limit."

31. In a section entitled, "Quality Control and Technical Assistance," the agency announced that although "[a] 120-day variance exclusion is permitted," the period had already begun to run and would end 29 days after the guidance issuance date, on November 1, 2025.

32. On October 3, 2025, USDA sent MDHS the ABAWD Guidance via email.

33. On September 25, 2025, MDHS sent clarifying questions to FNS regarding the ABAWD provisions, particularly concerning the screening process at redetermination for ongoing participants with multi-year certification periods (like for those covered by the Maryland Senior Nutrition Assistance Program (MSNAP) or the Elderly Simplified Application Project (ESAP)).

34. FNS responded to the questions, stating that the National Office (NO) would address them in the forthcoming guidance but that there was "no estimated date for the guidance" at that time. This was a delay past the initially expected September 30th date that FNS committed to in their September 4, 2025 Information Memo.

35. The timeline above left less than a month to make significant systems changes to ensure that all newly required ABAWDs were correctly identified, develop a comprehensive screening tool, ensure adequate employment and training infrastructure to support to expanded case load, and, train both eligibility and employment and training staff on the

Page 10 -  DECLARATION OF GLORIA BROWN BURNETT

new work requirements and how supporting the newly impacted populations is different from previous ABAWD efforts.

36. In July, following the passage of H.R. 1, MDHS began to plan for the implementation of H.R. 1 changes to ABAWD eligibility. Staff reviewed the provisions of H.R. 1 and wrote initial drafts of the Action Transmittal to caseworkers, worked with the Maryland Department of Information Technology to make systems changes, and communicated with stakeholders to ensure the broader community understood the changes.

37. As described above, MDHS has already invested significant time and resources into planning and implementing the changes to SNAP eligibility made by H.R. 1. The ABAWD Guidance increased the costs required to implement the changes required by H.R. 1 by shortening the time states had to fully implement the changes. Specifically:

   a. Cases subject to ABAWD requirements generally take twice as much administrative effort to process compared to non-ABAWD cases, due to the need to regularly verify work hours, earnings, and/or other qualifying work activities.

   b. Maryland had to update our E&E system to reflect the new changes. This incurs additional staff time in MDHS and the Maryland Department of Information Technology to update data fields to correctly create the new categories of customers who must comply with the ABAWD requirements.

   c. MDHS revised its ABAWD screening tool to reflect the new requirements and new exceptions, and has presented this tool and the new procedures in at least 14 different presentations to partner agencies, the Maryland General Assembly, and community stakeholders.

Page 11 -  DECLARATION OF GLORIA BROWN BURNETT

38. MDHS drafted an Action Transmittal to staff to explain the changes, which requires review across MDHS for accuracy and completeness, as well as review by 24 Local Departments of Social Services.

39. MDHS has screened 22,000 current participants who recertified between November 1, 2025 and March 1, 2026. We have mailed 10,465 notices and warnings to customers regarding potential noncompliance with the work requirements.

40. The ABAWD Guidance elevates the risk that Maryland will face massive financial penalties due to inadvertent noncompliance with H.R. 1 and/or the Guidance. As noted above, Section 10105 of H.R. 1 created a new set of penalties for States tied to their payment error rates. The Guidance stated that the exclusionary period ended on November 1, 2025. Historically, MDHS experiences more errors as we figure out how to implement new guidance. Thus, USDA may attempt to count any so-called "errors" stemming from the ABAWD Guidance as part of Maryland's payment error rate, increasing the risk that Maryland may have to pay financially ruinous penalties. And USDA claims the authority to be able to count those errors starting November 1, 2025, drastically shortening the period for full compliance, further increasing the chance of these penalties.

C.   **USDA's November 14 Guidance Related to Exclusionary Period Memo**

41. On November 14, 2025, USDA issued a policy memo (the "Exclusionary Period Memo") answering "follow-up questions submitted by State agencies on the variance exclusion period for implementation" of Sections 10102 and 10103 of H.R. 1. The Exclusionary Period Memo reiterated that the "required implementation date" for both Sections 10102

Page 12 -  DECLARATION OF GLORIA BROWN BURNETT

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

and 10103 of H.R. 1 was "the enactment of [H.R. 1], July 4, 2025" and therefore the exclusionary period had already ended 14 days prior.

**D.    Additional Harm to Maryland**

42. Detailed guidance on Section 10108 (Alien Eligibility) was not published until **October 31, 2025**—only one day before the "hold harmless" period for Quality Control was set to expire.

43. **The "Gap" Period:** For nearly four months (July to October), Maryland was forced to operate in a state of policy limbo, attempting to interpret sweeping legislative changes without federal technical assistance.

44. **Late Coding:** Maryland could not finalize system logic for the new immigrant eligibility tiers until late 2025.

45. **Accuracy Improvements:** It was not until **January 23, 2026**, that Maryland successfully deployed system improvements to accurately capture the nuanced immigration statuses required by the corrected guidance issued by FNS on December 09, 2025.

46. **Interactive Training:** Due to the complexity of the rules, Maryland had to roll out **AI-powered interactive training** for caseworkers. This was necessary to help staff practice real-life scenarios, as the manual policy updates were too dense to implement through traditional memos alone.

47. **Call Volume:** Inconsistencies in federal guidance led to a **25% increase** in call volume to Maryland service centers from panicked residents, further straining the workforce.

48. **Policy Retractions:** MDHS had to pivot its policy issuance multiple times to align with the litigation outcomes and significant changes FNS made to the policy after the expiration of the hold harmless date of November 1, 2025.

Page 13 -  DECLARATION OF GLORIA BROWN BURNETT

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 20th day of March 2026.

_____
Gloria Brown Burnett
Interim Secretary
Maryland Department of Human Services

Page 14 -  DECLARATION OF GLORIA BROWN BURNETT