UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BROOKE ROLLINS, *in her official capacity as Secretary of the U.S. Department of Agriculture*, & U.S. DEPARTMENT OF AGRICULTURE<br><br>Defendants. | Case No. 6:25-cv-02186-MTK<br><br>**OPINION AND ORDER** |

**KASUBHAI,** United States District Judge:

Twenty-two states and the District of Columbia ("Plaintiffs") bring this action against the United States Department of Agriculture ("USDA") and Brooke Rollins in her official capacity as Secretary of the USDA ("Defendants"). Plaintiffs claim Defendants' memoranda implementing recent changes to the Supplemental Nutrition Assistance Program violate the Administrative Procedure Act. Before the Court are Plaintiffs' Motion for Summary Judgment (ECF No. 80) and Defendants' Cross Motion for Summary Judgement (ECF No. 92). For the reasons below, Plaintiffs' motion is granted, and Defendants' motion is denied.

## BACKGROUND

### I. The Supplemental Nutrition Assistance Program

Congress enacted the Supplemental Nutrition Assistance Program ("SNAP") "to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households" through program benefits that "[increase] food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011. Under SNAP, eligible households, including certain non-citizens, receive benefits to buy food from approved stores. *Id.* §§ 2016(b), 2015(f). States administer SNAP and share administrative costs with the federal government, but the federal government funds the benefits. *Id.* §§ 2013(a), 2020(a), 2025(a).

Congress authorized USDA to issue regulations to ensure the effective administration of SNAP. *Id.* § 2013(c). Congress charged USDA to "establish uniform national standards of eligibility" for SNAP and required state agencies to comply with those standards. *Id.* § 2014(b). Through that authority, USDA reviews state plans to administer SNAP and monitors states' compliance with SNAP. 7 C.F.R. § 275.3.

#### A. H.R. 1

Congress amended SNAP by passing H.R. 1 on July 4, 2025. One Big Beautiful Bill Act, H.R. 1, 119th Cong. (2025). Among other changes, Congress (1) limited the categories of non-citizens eligible to receive SNAP benefits, (2) limited automatic qualification for standard utility allowances, (3) narrowed categories of work exemptions for able-bodied adults without dependents, and (4) added a "state quality control incentive" which requires a state to pay a portion of the cost of SNAP benefits if the state exceeds certain "payment error rates." H.R. 1 §§ 10108 (non-citizen eligibility), 10103 (standard utility allowances), 10102 (able-bodied adults), 10105(a) (quality control incentive); *see also* 7 U.S.C. § 2025(c)(2) (defining payment error

rates). Plaintiffs' challenge implicates the substance of H.R. 1's changes to the state quality control incentive and non-citizen eligibility.

1. The State Quality Control Incentive

Seeking to "encourage[] States to administer the SNAP program more efficiently and effectively" and address "the minimal incentive for States to control costs, enhance efficiencies, and improve outcomes for recipients," Congress enacted the state quality control incentive provision. H.R. Rep. No. 119-106(I), at 47-48, 50-51 (2025); H.R. 1 § 10105(2). The provision reduces the amount of federally funded SNAP benefits based on a state's "payment error rate," leaving the state to pay the remainder. 7 U.S.C. § 2013(2). Before H.R. 1, payment error rates were applied to the administrative costs associated with SNAP but not the cost of the benefits. *See* 7 U.S.C. § 2025(c); *id.* § 2013 (2018). The payment error rate is calculated based on the value of benefits that states issue to ineligible households, overissue to eligible households, and underissue to eligible households. *Id.* § 2025(c)(2); *see also* 7 C.F.R. § 271.2 (defining rates of overpayment error, under issuance error, and overissuance error). If a state's payment error rate increases, so does the state's share of the cost of SNAP benefits. 7 U.S.C. § 2013(a)(2)(B). For example, a state with the national average payment error rate of 11.68 percent would have a cost share of fifteen percent of the cost of SNAP benefits in the state where it previously would only have paid administrative costs. *Id.* § 2013(a)(2)(B)(i)(IV); H.R. Rep. No. 119-106(I), at 48.

A state bears no share of the cost of SNAP benefits until fiscal year 2028. 7 U.S.C. § 2013(a)(2)(B)(ii) In calculating the cost share for fiscal year 2028, the state may elect to use its payment error rates from either fiscal year 2025 or fiscal year 2026. *Id.* § 2013(a)(2)(B)(ii). Thereafter, the state's cost share in a given fiscal year is calculated on the payment errors rates for the third preceding fiscal year. *Id.* As a result, the state's payment error rates in fiscal year 2025 or fiscal year 2026 determines its share of the cost of SNAP benefits in fiscal year 2028,

and the state's payment error rate in fiscal year 2026 determines its cost share in fiscal year 2029. *See id.*

2. Non-Citizen Eligibility

Prior to H.R. 1, non-citizens classified as individuals granted asylum, refugees, and certain humanitarian parolees were eligible for SNAP benefits. *Id.* § 2015(f) (2018). H.R. 1 restricted SNAP eligibility to only three categories of non-citizens: (1) immigrants lawfully admitted for permanent residence (LPRs), (2) Cuban and Haitian entrants, and (3) individuals lawfully residing in the U.S. in accordance with a Compact of Free Association. H.R. 1 § 10108.

An LPR is, generally, an immigrant who has been "lawfully accorded the privilege of residing permanently in the United States." 8 U.S.C. § 1101(a)(20). An LPR may only receive SNAP benefits if they meet certain criteria. *Id.* §§ 1612(a)(1) (limiting eligibility of qualified aliens), 1612(a)(3), 1641(b) (including LPRs in the definition of "qualified alien"), 1612(a)(2) (listing exceptions). H.R. 1 did not change the definition of LPR or alter the criteria an LPR must meet to receive SNAP benefits.

H.R. 1 similarly did not affect the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"). Under PRWORA, "qualified aliens" are only eligible for SNAP under certain exceptions. 8 U.S.C. § 1612(a)(1), (a)(2). If a "qualified alien" lives in the United States as an LPR for at least five-years, they may become eligible for SNAP. *Id.* § 1612(a)(2)(L). Certain groups need not wait five years, including "Deportation Withheld," "Refugees," "Individuals Granted Asylum," and certain Afghan and Ukrainian parolees (collectively, "Humanitarian Immigrant Groups"). *Id.* § 1612(a)(2)(A)(i)-(iii); 22 U.S.C. § 7105(b)(1)(A); *see also* 7 C.F.R. § 273.4(a)(6)(ii)-(iii) (distinguishing between those subject to the five-year waiting period and those not).

### B. The Exclusionary Period

H.R. 1 did not eliminate statutory and regulatory exclusionary periods, under which certain variations in a state's payment rates are not counted towards its payment error rates. Congress provided a statutory exclusion for "[a]ny errors resulting in the application of new regulations promulgated under [SNAP] during the first 120 days from the required implementation date for such regulations." 7 U.S.C. § 2025(c)(3). USDA regulations also provide a regulatory exclusion for "any variance resulting from application of a new Program regulation or implementing memorandum of a mandatory or optional change in Federal law that occurs during the first 120 days from the required implementation date." 7 C.F.R. § 275.12(d)(2)(vii). "Variance means the incorrect application of policy and/or" the difference in SNAP issuance caused by application of incorrect information. *Id.* § 271.2. The regulatory and statutory exclusions give states a grace period under which they can adapt their SNAP programs to changes in law without fearing an increase in their payment error rate, and correspondingly, an increase in the amount of SNAP benefits they would owe under the quality control provision. Plaintiffs challenge here deals with the regulatory exclusion.

## II. USDA's Guidance

### A. The Exclusionary Period

Defendants issued four memoranda (collectively, "Guidance Documents") to state agencies implementing H.R. 1's changes to the SNAP program. Administrative Record ("AR") at GOV000014 (Aug. 29, 2025), GOV000008 (Oct. 3, 2025), GOV000018 (Oct 31, 2025), GOV000006 (Nov. 14, 2025), ECF No. 77. Each memorandum provided that states would be held harmless for errors in applying H.R. 1's changes until November 1, 2025, 120 days from the date of H.R. 1's enactment, and therefore set July 4, 2025, as the "required implementation date" of H.R. 1's changes to SNAP. AR at GOV000017, GOV000012, GOV000020-21, GOV000007.

Plaintiffs challenge Defendants' position that the required implementation date is the date of H.R. 1's enactment.

### B. The Non-Citizen Guidance

Defendants' October 31, 2025, memorandum ("Non-Citizen Guidance") provided guidance to the states regarding H.R 1's changes to Non-Citizen Eligibility. AR at GOV000018. The Non-Citizen Guidance included charts listing the eligibility of certain non-citizens for SNAP benefits. AR at GOV000022-28. These charts designate certain groups as "not eligible" for SNAP benefits and others as "not eligible unless an LPR" and list groups that can become eligible for SNAP without satisfying an otherwise mandatory five-year waiting period. AR at GOV000024-25. Plaintiffs claim that the Non-Citizen Guidance failed to include Humanitarian Immigrant Groups as (1) eligible if they become LPRs and (2) exempt from the five-year waiting period.

On December 9 and 10, 2025, Defendants released "question-and-answer" documents "provid[ing] additional information" on Non-Citizen eligibility. AR at GOV000029; Defs.' Cross Mot. Summ. J. & Opp'n 11 n.1, ECF No. 92. The December 10 question-and-answer document ("Q&A Guidance") is consistent with Plaintiffs' interpretation of H.R. 1's changes to non-citizen eligibility. AR at GOV000031. USDA has not revised its regulations to reflect H.R. 1's changes to the SNAP program. *Compare* 7 U.S.C. § 2015(f) *with* 7 C.F.R. § 273.4.

## III. Plaintiffs' Efforts to Implement H.R. 1

Soon after Congress passed H.R. 1, many Plaintiffs requested guidance from Defendants on how to implement the changes to the SNAP program. *E.g.*, DeMarco Decl. ¶ 20 (New York), ECF No. 5; Merolla-Brito Decl. ¶ 18 (Rhode Island), ECF No. 21; Frisch Decl. ¶ 18 (Michigan), ECF No. 16. Defendants failed to respond to some Plaintiffs' requests for guidance. *See, e.g.*, Frisch Decl. ¶ 18 (Michigan); Morishige Decl. ¶ 21 (Hawai'i), ECF No. 11. When Defendants

responded to other requests, they told states that additional guidance would be forthcoming. *E.g.*, DeMarco Decl. ¶ 20 (New York); Merolla-Brito Decl. ¶ 18 (Rhode Island); López Decl. ¶¶ 22-24 (Maryland), ECF No. 14; Reyes Decl. ¶¶ 12-14 (Washington), ECF No. 22. USDA told Massachusetts and Oregon to wait until it released guidance before implementing any H.R. 1 changes. Cole Decl. ¶ 14 (Massachusetts), ECF No. 15; Hoffman Suppl. Decl. ¶ 20 (Oregon), ECF No. 82. Some Plaintiffs also began to prepare their systems and practices to accommodate H.R. 1's changes while they awaited guidance. *E.g.*, Tomasky Decl. ¶ 18 (New York), ECF No. 81; Hoffman Suppl. Decl. ¶¶ 21, 26 (Oregon); Perry Decl. ¶ 18 (Minnesota), ECF No. 17; Hall Decl. ¶ 20 (Delaware), ECF No. 9; Armijo Decl. ¶¶ 24-28 (New Mexico), ECF No. 19. Some decided to implement substantive changes in H.R. 1 rather than wait for Defendants' guidance. *E.g.*, Hoffman Suppl. Decl. ¶ 31 (Oregon); Cole Decl. ¶¶ 23-25 (Massachusetts); Reagan Decl. ¶ 20 (Illinois), ECF No. 12; Armijo Decl. ¶ 30 (New Mexico).

Defendants released guidance on H.R. 1's changes to standard utility allowance credits on August 29, 2025. AR at GOV000014. The guidance set forth, for the first time, Defendants' position that the exclusionary period to implement H.R. 1's changes to SNAP began on enactment of H.R. 1. AR at GOV000017; Yaffe Suppl. Decl. ¶ 17 (Maine), ECF No. 85. Under this interpretation, Plaintiffs' errors after the next sixty-four days would count towards their payment error rates. *See* AR at GOV000012.

Defendants' next guidance came on October 3, 2025, in a document providing information on how to implement H.R. 1's changes to SNAP eligibility for able-bodied adults without dependents. AR at GOV000008. Again, the guidance provided that the implementation date for the changes began on the enactment of H.R. 1, meaning states had twenty-nine

remaining days to implement changes without having errors counted in their payment error rates. *See id.*

Defendants issued the Non-Citizen Guidance on October 31, 2025. AR at GOV000018. Defendants again set the exclusionary period to begin on H.R. 1's enactment, meaning states would only have one day between receiving the Non-Citizen Guidance and the end of the exclusionary period. AR at GOV000021.

Finally, Defendants issued an exclusionary period memo on November 14, 2025, to answer "follow-up questions submitted by State agencies on the variance exclusion period for implementation of [H.R. 1]." AR at GOV000006. The memo states that the regulatory exclusionary period for implementing H.R. 1's changes ended thirteen days earlier, on November 1, 2025. AR at GOV000007.

The Guidance Documents caused widespread confusion for Plaintiffs and their SNAP agencies. In the past, state agencies have waited until USDA issues guidance before implementing statutory changes to SNAP to ensure compliance with USDA's interpretation of the law. *E.g.*, Tomasky Decl. ¶¶ 13-14 (New York); Hoffman Suppl. Decl. ¶¶ 11-12 (Oregon); McClelland Suppl. Decl. ¶¶ 11-12 (Colorado), ECF No. 83; Hadler Suppl. Decl. ¶¶ 11-12 (Connecticut), ECF No. 84; Yaffe Suppl. Decl. ¶¶ 14-15 (Maine); Burnett Decl. ¶¶ 10-11 (Maryland), ECF No. 86; Frisch Suppl. Decl. ¶¶ 11-12 (Michigan), ECF No. 87; Hogan Suppl. Decl. ¶ 15 (North Carolina), ECF No. 88. After receiving notice that the exclusionary period was well under way, Plaintiffs rushed to implement the changes. Some states instituted manual workarounds to complicated systems with increased risk of human error, reprogrammed applications, or retrained personnel. *See, e.g.*, Hogan Suppl. Decl. ¶¶ 30, 38, 39 (North Carolina);

Hadler Suppl. Decl. ¶¶ 27, 33 (Connecticut). Maryland experienced a twenty-five percent increase in calls from residents affected by the Non-Citizen Guidance. Burnett Decl. ¶ 47.

The changes made by H.R. 1 posed particular challenges to Plaintiffs. North Carolina viewed the changes to SNAP for able-bodied adults without dependents as "one of the most complex sets of SNAP eligibility changes in the program's history." Hogan Suppl. Decl. ¶ 36. In Maryland, SNAP cases involving able-bodied adults without dependents require twice as much administrative effort. Burnett Decl. ¶ 37.

For Plaintiffs' SNAP programs and those who depend on them, the consequences are severe. Plaintiffs historically experience higher payment error rates after changes to the SNAP program. *E.g.*, Hoffman Suppl. Decl. ¶ 16 (Oregon), McClelland Suppl. Decl. ¶ 15 (Colorado); Tomasky Decl. ¶ 14 (New York). Plaintiffs expect that their payment error rates could cause their share of the cost of SNAP benefits to increase by hundreds of millions of dollars. *E.g.*, Adelman Decl. ¶¶ 30, 32 (New Jersey), ECF No. 18; Cole Decl. ¶ 29 (Massachusetts); Reyes Decl. ¶ 33 (Washington). For example, If North Carolina's SNAP payment error exceeds ten percent in fiscal year 2026, its cost share in fiscal year 2028 would reach $420 million—enough to effectively end the provision of SNAP in that state and cut off aid to 1.4 million North Carolinians. Hogan Decl. ¶ 25, ECF No. 20.

## IV. Procedural History

Plaintiffs filed this action and moved for a preliminary injunction on November 26, 2025, challenging Defendants' Non-Citizen Guidance and exclusionary period as contrary to law and arbitrary and capricious under the Administrative Procedure Act. Compl. 18-23, ECF No. 1. Plaintiffs moved for a preliminary injunction preventing Defendants from enforcing the Non-Citizen Guidance and the exclusionary period against Plaintiffs or counting errors from misapplication of H.R. 1 to their SNAP programs. Pl. States' Mot. Prelim. Inj. 32, ECF No. 4.

The Court heard oral argument on the preliminary injunction motion and granted it on December 15, 2025. ECF No. 64; Tr. 127-34, ECF No. 65. Plaintiffs amended their complaint on January 30, 2026. First Am. Compl. 1, ECF No. 68. The parties thereafter submitted cross motions for summary judgment.

**STANDARDS**

Judicial review of agency action is governed by the Administrative Procedure Act. 5 U.S.C. § 706. The reviewing court:

> must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citations omitted), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 (1977).

Agency decisions are "entitled to a presumption of regularity." *Id.* at 415. While such review is deferential to the agency action taken, the court must not "rubber-stamp" the agency action as correct. *Lands Council v. Martin*, 529 F.3d 1219, 1225 (9th Cir. 2008); *N. Spotted Owl v. Hodel*, 716 F. Supp. 479, 482 (W.D. Wash. 1988).

A court may set aside an agency's action if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). "[I]f an agency 'fails to consider an important aspect of a problem . . . [or] offers an explanation for the decision that is contrary to the evidence,' its action is arbitrary and capricious." *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 888–89 (9th Cir. 2007) (quoting *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005)). "An agency action is also arbitrary and capricious if the agency fails to 'articulate a satisfactory explanation for its action including a "rational connection between the facts found

and the choice made.'" *Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.*, 12 F. Supp. 2d 1121, 1131 (D. Or. 1997) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## DISCUSSION

### I. Mootness

Defendants argue that Plaintiffs' challenge to the eligibility requirements set forth in Defendants' Non-Citizen Guidance is moot because, following issuance of the December 10, 2025, Q&A Guidance, both parties agree on H.R. 1's changes to non-citizen SNAP eligibility.

A federal court has no authority "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (citation omitted). "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (citing *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (citations omitted). The central question of a mootness challenge is "not whether the precise relief sought at the time the [action] was filed is still available," but rather "whether there can be any effective relief." *West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 925 (9th Cir. 2000) (quotation marks omitted).

"The voluntary cessation of challenged conduct does not ordinarily render a case moot" because dismissal would allow the challenged conduct to resume as soon as the case is dismissed. *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) (citations omitted). When a government entity voluntary ceases its challenged conduct, the court generally presumes that the government entity acts in good faith, but the governmental entity "still must bear the heavy

burden of showing that the challenged conduct cannot reasonably be expected to start up again." *Id.* at 971. Courts may find mootness more likely if the policy change is broadly and unequivocally stated, fully addresses the dispute, resulted from the litigation at issue, has long been in place, and the agency has not engaged in conduct similar to the challenged conduct. *Id.* at 972. An action is not likely moot, however, if the new policy "could be easily abandoned or altered in the future." *Id.*

An analysis of the relevant factors and the government's conduct in this case establishes that Plaintiffs' challenge to the Non-Citizen Guidance is not moot. Although Defendants' Q&A agrees with Plaintiffs' position, Defendants assert that the October 31 Non-Citizen Guidance contained no legal errors. Defendants have not rescinded the October 31 Non-Citizen Guidance or acknowledged a substantive error in it. Instead, Defendants contend that the Non-Citizen Guidance "was not erroneous," view Plaintiffs' position as a misinterpretation, and insist that the Non-Citizen Guidance is consistent with the Q&A and "never excluded certain LPRs from SNAP eligibility." Defs.' Cross Mot. Summ. J. & Opp'n 23; Defs.' Reply 4, ECF No. 96. This is not the broad and unequivocal change in policy envisioned by *Rosebrock*, and it indicates that Defendants have not fully addressed Plaintiffs' challenge despite the fact that Defendants appear to have issued the Q&A in direct response to this litigation, and the Q&A applied long-standing provisions of non-citizen SNAP eligibility. Defendants continue to argue that the Non-Citizen Guidance complies with the law, weighing heavily against a finding that the Q&A moots this case. *See West Virginia v. Env'l Prot. Agency*, 597 U.S. 697, 720 (2022) (finding no mootness where government vigorously defended its past approach).

Although the parties agree on H.R. 1's changes to non-citizen eligibility, they continue to dispute whether the Non-Citizen Guidance conforms to the law. This action is accordingly not moot.

**II. Final Agency Action**

The APA limits judicial review to "final agency action." 5 U.S.C. § 704. An agency action is final when it (1) marks the "consummation of the agency's decision-making process," not merely a "tentative or interlocutory" decision, and (2) is an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citations and quotation marks omitted). In applying the *Bennett* test, courts in the Ninth Circuit consider factors including "whether the action 'amounts to a definitive statement of the agency's position,'" whether the action had a direct and immediate effect on the subject party's daily operations, and whether the agency expects immediate compliance with the terms of the action. *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006); *Nat'l Lab. Rels. Bd. v. Siren Retail Corp.*, 99 F.4th 1118, 1123 (9th Cir. 2024).

The Ninth Circuit has cautioned that "an agency's characterization of its action as being provisional or advisory is not necessarily dispositive." *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094 (9th Cir. 2014). Instead, "[i]t is the effect of the action and not its label that must be considered." *Or. Nat. Desert Ass'n*, 465 F.3d at 985 (citation omitted). Thus, an agency's interpretive rule, such as its interpretation of a statute, may qualify as a final agency action. *See Waterkeeper Alliance v. U.S. Env't Prot. Agency*, 140 F.4th 1193, 1206-07 (9th Cir. 2025); *Cal. Cmtys. Against Toxics v. Env't Prot. Agency*, 934 F.3d 627, 635 (D.C. Cir. 2019) (citing *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92 (2015)).

Defendants argue that the Guidance Documents are not final agency action because they simply restate the requirements of H.R. 1 and therefore place no legal obligation on Plaintiffs.

**A. Consummation of the Decision-making Process**

To satisfy the first prong of the *Bennett* test, the agency action must "mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 177-78 (citation omitted). Defendants do not contend that their Guidance Documents fail this prong of the *Bennett* test, and the Court finds that the documents mark the consummation of Defendants decision making process because they call for immediate compliance and make Defendants' position sufficiently clear. AR at GOV000020 ("State agencies must immediately apply the new eligibility criteria to new applicants . . . ."); AR at GOV000011, GOV000015.

**B. Legal Consequences or Obligations**

To satisfy the second prong of the *Bennett* test, the action "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178. The second prong provides several avenues for an agency action to meet the finality requirement, including the imposition of an obligation, denial of a right, or fixation of some legal relationship. *Oregon Nat. Desert Ass'n*, 465 F.3d at 986-87. The Ninth Circuit focuses on the "practical and legal effects" of the action and interprets finality in a "pragmatic and flexible manner." *Id.* at 982 (citation omitted). Courts must consider whether challenged agency actions have the "status of law or comparable legal force, and whether immediate compliance with its terms is expected." *Id.* Agency action may be final if it directly and immediately affects "the day-to-day business of the subject party." *Id.* at 987 (internal quotation marks and citation omitted).

Defendants attempt to cast their Guidance Documents as non-binding interpretive rules that do no more than repeat what H.R. 1 requires. Defendants' position is unavailing. By their own terms, the Guidance Documents direct states to immediately change their day-to-day screening of SNAP applications. AR at GOV000011 (Oct. 3 guidance), GOV000015 (Aug. 29 guidance), GOV000020 (Oct. 31 guidance). The Guidance Documents also announced Defendants' position that the required implementation date under USDA regulations began on the date Congress enacted H.R. 1. AR at GOV000017 (Aug. 29 guidance), GOV000020 (Oct. 31 guidance), GOV000007 (Nov. 14 guidance), GOV000012 (Oct. 3 guidance). In so doing, the Guidance Documents set the exclusionary period, informing Plaintiffs that they could only exclude variances resulting from the relevant changes to H.R. 1 within 120 days of July 4, 2025 (i.e., until November 1, 2025) under USDA regulations. *See, e.g.*, AR at GOV000006; *see also* 7 C.F.R. § 275.12(d)(2)(vii). The Guidance Documents therefore notify Plaintiffs of the date after which USDA would count variances in their payment rates resulting from H.R. 1's changes. After that date, variances go towards the share of SNAP benefits a state must pay under H.R. 1's quality control incentive provision.

The Guidance Documents have the force of law and immediate compliance with their terms is expected because they call for immediate implementation, announce Defendants' position as to the exclusionary period, and affect Plaintiffs' cost share of SNAP benefits. The exclusionary period set forth in the guidance is final agency action.

### III. Regulatory Exclusionary Period

Plaintiffs challenge the regulatory exclusionary period announced in the Guidance Documents as (1) contrary to Defendants' regulations and (2) arbitrary and capricious. Defendants oppose Plaintiffs' arguments and the admissibility of evidence they rely on. The

Court first turns to the admissibility of Plaintiffs' evidence before addressing the lawfulness of the Guidance Documents.

**A. The Administrative Record**

As a preliminary matter, the parties dispute the admissibility of certain documents outside the administrative record, which Plaintiffs contend are relevant to their claims related to the exclusionary period. A court's review under the APA is generally confined to the administrative record. 5 U.S.C. § 706; *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019). "The whole administrative record, however, is not necessarily those documents that the agency has compiled and submitted as the administrative record." *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (quotation marks and citations omitted). Rather, the whole record "consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position." *Id.*

An agency is entitled to a presumption that the administrative record it submits is complete, but that presumption may be rebutted with "clear evidence" to the contrary. *Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 445 (9th Cir. 2024) (quoting *Goffney v. Becerra*, 995 F.3d 737, 748 (9th Cir. 2021)). Further, courts may admit supplemental information if the agency presents an administrative record that is so sparse as to "frustrate effective judicial review." *Midwater Trawlers Coop v. Dep't of Commerce*, 393 F.3d 994, 1007 (9th Cir. 2004).

A court may admit extra record evidence "(1) if admission is necessary to determine 'whether the agency has considered all relevant factors and has explained its decision,' (2) if 'the agency has relied on documents not in the record,' (3) 'when supplementing the record is necessary to explain technical terms or complex subject matter,' or (4) 'when plaintiffs make a showing of agency bad faith.'" *Lands Council*, 395 F.3d at 1030 (citation omitted).

Here, Defendants submitted an administrative record that consists of the six documents it sent to states regarding H.R. 1's changes to SNAP, existing statutory and regulatory provisions, and excerpts from H.R. 1. ECF No. 76. Defendants did not provide any documentation of their communication with states attempting to implement H.R. 1's changes to SNAP. Plaintiffs provided declarations from state SNAP agencies attesting to USDA's practice of setting a required implementation date after it issues guidance. Defendants argue that Plaintiffs' evidence is improper because courts limit the admission of extra record evidence to highly technical matters. Defendants' position ignores that *Lands Council* provides for three other exceptions, including whether the agency has considered the relevant factors and explained its decision.

Defendants curated an administrative record that is so sparse as to frustrate effective judicial review because they omit all communications from Plaintiffs and any context for their decision to set the required implementation date. The Court is unable to discern whether Defendants considered the relevant factors and explained their decision on the record Defendants would now have the Court rely. The Court will allow Plaintiffs' declarations to assess whether Defendants considered the relevant factors and explained their decision. *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014).

The Court further finds that Plaintiffs have produced clear evidence to rebut the presumption that Defendants submitted a complete administrative record. Defendants in this case have intentionally omitted the very concerns of the states they purport to address in their Guidance Documents. Defendants would have the Court view H.R. 1's changes to SNAP in a vacuum, ignore how Defendants have administered past changes to the SNAP program, and conceal relevant evidence contrary to their opinion.

**B. Contrary to Law (Count III)**

Plaintiffs and Defendants dispute when the exclusionary period begins. Defendants argue that the exclusionary period started immediately with the enactment of H.R. 1 because that statute was made effective immediately. Plaintiffs argue that Defendants' position is contrary to law because USDA regulations provide for an exclusionary period that begins after USDA issues its guidance to states.

Both parties agree that the regulatory exclusionary period begins "on the required implementation date." 7 C.F.R. § 275.12(d)(2)(vii). Neither the statutes nor the regulations define "required implementation date." The "required implementation date" begins the regulatory exclusionary period under which "variance resulting from application of a new Program regulation or implementing memorandum of a mandatory or optional change in Federal law" are not counted towards a state's payment error rates. Put simply, when USDA promulgates a new regulation or issues an "implementing memorandum" after a change in federal law, states have 120 days from the "required implementation date" until their variances (mistakes from misapplication of policy or information) will be counted towards their error rate.

Defendants argue that Congress determined "the required implementation date" for H.R. 1's changes when it made H.R. 1 effective on enactment. The parties do not dispute that H.R. 1 was effective upon enactment. The question before the Court is not when H.R. 1's enactment or effective date may be. Rather, the question is when the exclusionary period begins—that being the required implementation date.

The Court must analyze the relevant statutes and regulations to answer this question. Courts first attempt to discern the plain meaning of a regulation using standard tools of interpretation. *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019). The court must consider "the text, structure, history, and purpose of a regulation." *Id.* If the court, after exhausting tools of

construction, finds that the regulation is ambiguous it considers whether to defer to the agency's interpretation under so-called *Auer* deference. *Id.* at 575-76. *Auer* deference is not appropriate in several circumstances, including where the agency's interpretation is not reasonable, fails to reflect the agency's "fair and considered judgment," or "creates 'unfair surprise' to regulated parties." *Id.* at 579-80.

The Court turns to the text of the regulation, considering the "regulatory scheme 'as a whole.'" *Amazon.com Inc. v. Comm'r Internal Rev.*, 934 F.3d 976, 986 (9th Cir. 2019). The relevant regulation references implementing or implementation multiple times: it conditions variance as (1) resulting from a new regulation or "implementing memorandum of a mandatory or optional change in Federal law" and (2) occurring within "the first 120 days from the required implementation date." 7 C.F.R. § 275.12(d)(2)(vii). If a regulation allows a state to implement changes before the "required implementation date," the date that the "state agency chooses to implement may, at the option of the State, be considered to be the required implementation date for purposes of this provision." *Id.* § 275.12(d)(2)(vii)(A). "[I]mplementation occurs on the effective date of [the] State agency's written statewide notification to its eligibility workers." *Id.* § 275.12(d)(2)(vii)(M).

These provisions make two things clear. First, variance must result from a new regulation or a new "implementing memorandum" and Defendants issue memoranda telling states how to implement "a mandatory or optional change in federal law," as they did here. AR at GOV000008 ("This *memorandum* provides State agencies additional information on *implementing* Section 10102(a) of [H.R. 1] . . . ."), GOV000014 "The Food and Nutrition Service (FNS) is issuing this *memorandum* to provide Supplemental Nutrition Assistance Program (SNAP) State agencies with additional information on *implementing* Section 10103 of [H.R. 1] . . . ."), GOV000018

("This *memorandum* provides State agencies with additional information on *implementing* Section 10108 of [H.R. 1] . . . .") (emphasis added in all). Second, the "required implementation date" means the date a state agency must issue statewide notification to its workers of changes to SNAP. Both support Plaintiffs' interpretation. Variance results from mistakes following Defendants' issuance of a new implementing memorandum or regulation. Requiring states to issue statewide notice before they receive that implementing memorandum contradicts the text of the regulation.

Defendants argue that this Court should apply the plain meaning of "implement" which they contend means "to give practical effect and ensure of actual fulfilment by concrete measures." Defs.' Cross Mot. Summ. J. & Opp'n 25, ECF No. 92. Defendants argue this definition comports with their view that the exclusionary period began on H.R. 1's enactment because Congress intended H.R. 1 to have practical effect immediately. Defendants err not in their definition of "implement" but in applying it at such a high level of generality as to displace the regulatory scheme.

Defendants rely heavily on congressional intent but acknowledge H.R. 1 is silent as to the effective dates of the relevant changes to SNAP. Absent contrary Congressional intent, a law is effective when it is enacted. *Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991). Defendants stretch this principle too far, arguing that Congressional silence on the "effective date" of a legislative provision determines the "implementation date" under an existing administrative scheme. The regulatory scheme consistently contemplates the need to provide guidance and notice before implementing cost sharing rules.

The term "required implementation date" appears in SNAP's statutory structure. The statutory exclusionary period, which was unaltered by H.R. 1, excludes errors "resulting in the

application of new regulations promulgated under this chapter during the first 120 days from the required implementation date for such regulations." 7 U.S.C. § 2025(c)(3)(A). While the parties' dispute here turns on the regulatory exclusion, the presence of "required implementation date" in the statutory scheme indicates that Congress contemplated that phrase would have its own meaning. *California v. Trump*, 963 F.3d 926, 946 (9th Cir. 2020) ("'Congress' choice of words' is presumed to be deliberate and deserving of judicial respect.") (citation omitted).

USDA uses "effective date" and "implementation date" separately when it makes changes to its regulations. *See* 7 C.F.R. § 272.1(g) (requiring that amendments to regulations list an "implementation schedule"); Supplemental Nutrition Assistance Program (SNAP): Employment and Training Program Monitoring, Oversight and Reporting Measures, 89 Fed. Reg. 90547, 90547 (Nov. 18, 2024) (listing an implementation date and an effective date); Food Stamp Program: Anticipating Income and Reporting Changes, 68 Fed. Reg. 22567, 22567 (Apr. 29, 2003) (same). Moreover, when USDA most recently amended the regulatory exclusionary period, it explained that the regulatory exclusionary period is more extensive than its statutory counterpart: "[The statutory exclusionary period] is specific . . . to regulatory implementation. The Department's extension of that to implementation of legislative provisions is driven by the fact that many legislative provisions are effective immediately, prior to any regulation being published." Supplemental Nutrition Assistance Program: Quality Control Provisions of Title IV of Public Law 107-171, 75 Fed. Reg. 33422, 33434 (June 11, 2010). In other words, USDA designed the regulatory exclusionary period to account for implementing legislative provisions that are effective prior to any communication from USDA. This also weighs against a finding that Congress intended H.R. 1's effective date to serve as the required implementation date under

the regulatory scheme. *See Hall v. U.S. Dep't of Agric.*, 984 F.3d 825, 840 (9th Cir. 2020) ("Congress is presumed to be aware of an agency's interpretation of a statute.").

Defendants' interpretation is inconsistent with the text, context, and history of the regulatory exclusionary period. The exclusionary period set out in its Guidance Documents is contrary to law and not entitled to deference.

Even if the regulations were ambiguous, Defendants' interpretation is unreasonable. Defendants' interpretation would require states to immediately notify their agencies of any change in federal law that is effective upon enactment to receive the full exclusionary period. *See* 7 C.F.R. § 275.12(d)(2)(vii)(E), (C). In the case of H.R. 1, states would have had to issue their implementing memoranda on a federal holiday, July 4, 2025. Defendant's position is also unreasonable when applied to legislation that may fail at the eleventh hour. States would face a choice to either (A) invest potentially wasted time and resources to be able to issue their implementing memoranda immediately or (B) risk losing out on days in the exclusionary period. The absurdity of this position is underscored by the fact that the USDA took months after H.R. 1 passed to issue its own guidance.

It is further unreasonable for USDA to issue guidance in September, retroactively informing states that the exclusionary period began sixty-six days earlier and that states would only have sixty-four days of the exclusionary period remaining. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 264 (1994) (recognizing the axiom that "administrative rules will not be construed to have retroactive effect unless their language requires this result"). States would also be on their own to implement changes, undermining Congress's directive that USDA should implement SNAP to ensure uniform standards among states. *See* 7 U.S.C. § 2014(b).

Defendants' interpretation further fails to provide Plaintiffs with "fair warning of the conduct a regulation prohibits or requires." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (cleaned up). It is undisputed that in the past two decades, USDA has set a required implementation date that was (1) after it issued its implementing memo and (2) after the effective date of a statute six times. Courts rarely give deference to agency interpretations conflicting with prior ones and refuse to do so where the interpretation would retroactively penalize parties for longstanding conduct. *Kisor*, 588 U.S. at 579; *see also Christopher*, 567 U.S. at 157 (considering practices of a regulated group and the regulating agency in assessing whether *Auer* deference is appropriate). Plaintiffs' uncontroverted showing is sufficient to establish a past practice, and Defendants fail to provide any examples in support of their position. Defendants' interpretation deviates from their past practice and unfairly surprises Plaintiffs. Plaintiffs reasonably expected that they would receive guidance from Defendants with sufficient notice before the required implementation date. Defendants' refusal to provide that notice here unfairly exposes Plaintiffs to financially ruinous penalties. *Auer* deference is therefore inappropriate.

The Court rejects Defendants' argument that separating "required implementation date" from a statute's effective date "would give the Executive the power to pocket veto any statute simply by delaying or refusing to implement it." Def. Cross Mot. 27. This strawman argument ignores that agencies may face suit for failing to act. *E.g.*, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61-62 (2004); 5 U.S.C. § 551(13).

Defendants' concern that enacted statutes will be undermined by executive fiat is similarly overblown. Congress does not oversee or regulate SNAP alone; it delegates significant oversight authority to USDA. This includes the power to "formulate and administer" SNAP, 7 U.S.C. § 2013(a), to "issue such regulations . . . necessary or appropriate for the effective and

efficient administration" of SNAP, *id.* § 2013(c), to determine whether a state's administration of SNAP is inefficient or ineffective, *id.* § 2020(d), and to "carry out" a quality control system that requires states "with high payment error rates to share in the cost of payment error," *id.* § 2025(c)(1)(A). Defendants' position ignores the responsibility Congress charged them with in administering SNAP. Defendants' exclusionary period is contrary to law.

**C. Arbitrary and Capricious (Count IV)**

The Court further finds that Defendants' exclusionary period is arbitrary and capricious. An agency action is arbitrary and capricious if it fails to make a rational connection between the facts and the decision made. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Here, the Guidance Documents only give broad statements that H.R. 1 was effective immediately. AR at GOV000017, GOV000012, GOV000020-21, GOV000007. These cursory statements do not provide the "explained reasoning" required by the APA. *Nat'l Parks Conservation Ass'n v. E.P.A.*, 788 F.3d 1134, 1142-43 (9th Cir. 2015). Nor do they grapple with the appropriate facts. For example, the Guidance Documents do not explain why Defendants decided the required implementation date was July 4, 2025, after affirmatively telling states to wait to implement changes until they received guidance. The Guidance Documents also fail to explain why Defendants did not inform states that they considered July 4, 2025, to be the implementation date until August 29, 2025. AR at GOV000014.

Defendants' position also departs with its past practice. When an agency departs from past practice it must "provide a reasoned explanation for the change," acknowledge that it is changing position, and consider "serious reliance interests." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 568 (2025). This concept is intertwined with the requirement that agency action give "fair notice" to regulated parties. *Id.* at 569.

Defendants argue that Plaintiffs' evidence of USDA's past practice of setting the implementation date after a statute's effective date and issuance of guidance cannot establish an agency's prior position under *Wages & White Lion* because it lacks the formality of a binding document. Defendants are incorrect in both the premise and its application. The Supreme Court explicitly did not reach the issue in *Wages & White Lion*. *Id.* at 569 n.5 (assuming without deciding whether "the change-in-position doctrine applies to an agency's divergence from a position articulated in nonbinding guidance documents."). More fundamentally though, USDA, when it historically set the implementation date after the issuance of guidance, did not merely articulate a position in a nonbinding guidance document but identified a set date after which legal consequences flow (the counting or exclusion of payment error rates under the SNAP scheme). *See* 7 C.F.R. § 2025(d)(2)(vii) (historically excluding variances for the first 120 days after the required implementation date).

Defendants further argue that the six examples provided by Plaintiffs where USDA set an implementation date after a statutory change is insufficient to establish a past agency position. The Court disagrees. Defendants provide no meaningful counter examples, and Plaintiffs' examples are reinforced by uncontroverted declarations from state agencies.

The exclusionary period is also arbitrary and capricious for failing to provide fair notice to Plaintiffs. Defendants did not release their interpretation until well after the enactment of H.R. 1. When "an agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute." *Christopher*, 567 U.S. at 158; *see also id.* at 158-59 (recognizing the unfairness in requiring "regulated parties to divine the agency's interpretations in advance"). To capture the exclusionary period, Plaintiffs would have needed to anticipate that Defendants would require implementation upon enactment of H.R. 1.

Indeed, two states—Oregon and Massachusetts—would have needed to anticipate that Defendants would do so even after USDA provided contradictory instruction. Defendants' exclusionary periods are arbitrary and capricious because they are inadequately explained, fail to consider Plaintiffs' reliance interests, and fail to give Plaintiffs fair notice.

Defendants have placed Plaintiffs in an impossible situation to timely implement H.R. 1's changes to SNAP though contradictory, absent, and misleading messaging. Defendants now seek to penalize Plaintiffs' inability to overcome that impossibility by retroactively setting an exclusionary period that gives rise to potentially ruinous financial penalties. Defendants may not mask their conduct with attenuated inferences drawn from H.R. 1's effective date. The exclusionary period violates the APA.

## IV. Non-Citizen Guidance

The parties dispute the adequacy of Defendants' October 31, 2025, Non-Citizen Guidance. The Non-Citizen Guidance explains that H.R. 1 limited SNAP eligibility to certain groups, including LPRs. AR at GOV000018. Specifically, it states

> Following [H.R. 1], some alien groups previously eligible for SNAP are no longer eligible. Aliens continue to be subject to a 5-year waiting period, unless exempted by PRWORA. The chart below summarizes eligibility for aliens pursuant to [H.R. 1] amendments to section 6(f) of the FNA.

| Eligible Alien Groups Under the OBBB | Eligibility Timing |
| --- | --- |
| • Non-citizen U.S. nationals<br>• Cuban and Haitian entrants<br>• Compacts of Free Association (COFA) citizens | Eligible immediately, with no waiting period, as long as they meet all other SNAP financial and non-financial eligibility requirements. |
| • Lawful permanent residents (LPR) (also known as Green Card holders) | Eligible after a 5-year waiting period, as long as they meet all other SNAP financial and non-financial eligibility requirements.<br><br>LPRs may still be eligible for SNAP without a waiting period if they meet one or more of the following conditions:<br>• Are under 18 years old<br>• Have 40 qualifying work quarters<br>• Are blind or disabled<br>• Were lawfully residing in the U.S. and 65 or older on August 22, 1996<br>• Have a U.S. military connection<br>• Are admitted to the United States as an Amerasian immigrant<br>• Are an American Indian born abroad<br>• Certain Hmong or Highland Laotian tribal members |

The chart in Attachment 1 illustrates changes to SNAP alien eligibility.

AR at GOV000018-19. Humanitarian Immigrant Groups are omitted from the list of LPRs eligible for SNAP without a waiting period. AR at GOV000019, GOV000022.

The Non-Citizen Guidance also lists various non-citizen groups and their eligibility prior to and after passage of H.R. 1. Humanitarian Immigrant Groups are listed as "Not eligible" for SNAP. AR at GOV000024-25. Other groups are designated as "Not eligible unless an LPR." AR at GOV000024.

It is undisputed that LPR members of Humanitarian Immigrant Groups are in fact (1) eligible for SNAP and (2) exempt from the five-year waiting period. Plaintiffs contend that the Non-Citizen Guidance is contrary to law and arbitrary and capricious. The Court addresses each claim in turn.

**A. Contrary to Law (Count I)**

A court must set aside agency action that is contrary to law. 5 U.S.C. § 706(2)(D). Defendants argue that the Non-Citizen Guidance is consistent with the law and Plaintiffs misinterpret them. Defendants fail to explain, however, why Humanitarian Immigrant Groups are omitted from the list of non-citizen groups that are (1) eligible for SNAP if they are an LPR and (2) exempt from the five-year waiting period under PWRORA. With respect to the first omission, Defendants offer that the list of groups is intentionally inexhaustive, serving only to identify the most common exceptions relevant to H.R. 1's changes. Defendants point to language that states that LPRs are eligible for SNAP benefits if they meet other eligibility requirements. AR at GOV000018-19. This language, Defendants argue, means that the Non-Citizen Guidance recognizes that all LPRs are eligible for SNAP under PRWORA without any distinction as to whether they are a member of a Humanitarian Immigrant Group. The Non-Citizen Guidance, however, makes this distinction. It specifies certain groups are "not eligible [for SNAP] unless an LPR" while identifying others, including Humanitarian Immigrant Groups, as "not eligible."

Defendants argue that these more specific statements "should not override" the general statement that LPRs are eligible for SNAP benefits. Defendants offer no support for this assertion, and it runs counter to a well-established interpretive rule that the specific controls the general. *See Perez-Guzman v. Lynch*, 835 F.3d 1066, 1075 (9th Cir. 2016) (discussing the rule's application in analyzing statutes).

The Non-Citizen Guidance also omits Humanitarian Immigrant Groups from the list of those exempt from a waiting period for SNAP eligibility. Defendants argue that the list is meant to be a convenient reference for the most common exceptions to the general rule that an LPR may still be eligible for SNAP benefits without the five-year waiting period. Nothing in the Non-Citizen Guidance supports this view. It does not state it is meant only as a reference guide.

Defendants point to language preceding the list stating "LPRs may still be eligible for SNAP without a waiting period . . . ." According to Defendants, the "may" in that language indicates that the list is inexhaustive. Defendants neglect to address the conditional language that follows: "if [LPRs] meet one or more of the following conditions." AR at GOV000019. The conditional language is followed by a list of conditions, any one of which may be sufficient to exempt an LPR from the five-year waiting period. AR at GOV000019.

Humanitarian Immigrant Groups should be listed as both eligible for SNAP if they are an LPR and exempt from the five-year waiting period. The Non-Citizen Guidance communicates that they are not and is contrary to PWRORA.

**B. Arbitrary and Capricious (Count II)**

The Non-Citizen Guidance is also arbitrary and capricious. An agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem," or offered an explanation "that runs counter to the evidence before the agency." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (citation omitted), *overruled in part on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008). Agency actions "unsupported by any explained reasoning" are arbitrary and capricious. *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1143 (9th Cir. 2015). The Non-Citizen Guidance itself provides no explanation as to why Humanitarian Immigrant Groups are omitted from the list of non-citizen groups that are (1) eligible for SNAP if they are an LPR and (2) exempt from the five-year waiting period under PWRORA. As discussed above, Defendants' summary judgment briefing argues that the omissions result from the Non-Citizen Guidance's intended use as a quick reference guide. This explanation is absent from the record, and the Court rejects it as a post hoc rationalization of past agency action. *See Ctr. for Biological Diversity v. Zinke*, 900

F.3d 1053, 1069 (9th Cir. 2018). The Non-Citizen Guidance offers no explanation for its omissions and is arbitrary and capricious.

## V. Remedies

### A. Vacatur

The APA requires the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" that are unlawful under 5 U.S.C. § 706(2)(A)-(F), which includes all the provisions that Plaintiffs raised here. Vacatur is the presumptive remedy for unlawful agency action. *All. for the Wild Rockies v. U. S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018). While there are some circumstances under which remand without vacatur may be appropriate, *see Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012), Defendants have not argued those circumstances are present here.

Defendants, instead, argue that vacatur should be limited to the Plaintiffs in this case, citing the general rule that a remedy should be no more burdensome than necessary. This Court has rejected narrowing the presumptive remedy to a party-specific one in prior cases and again declines to do so here. *New York v. U.S. Dep't Energy*, No. 25-cv-01458, 2025 WL 3140578, at *16-17 (D. Or. Nov. 10, 2025) (recognizing that vacatur acts directly on the agency action and agency action is "the irreducible thing" over which the court has authority); *see also Massachusetts v. Nat'l Insts. H.*, 770 F. Supp. 3d 277, 329 (D. Mass. 2025) (citing cases).

Having found Defendants' exclusionary period violates the APA, The Court vacates the exclusionary period set forth in the Guidance Documents. The Court does not vacate the Guidance Documents in their entirety because the exclusionary periods are discrete agency action such that vacatur of the exclusionary periods is severable from the rest of the guidance. *See New York*, 2025 WL 3140578, at *16; 5 U.S.C. § 551(13).

### B. Declaratory Relief

Declaratory relief is appropriate where it will "serve a useful purpose in clarifying and settling the legal relations in issue" and "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Bilbrey v. Brown*, 738 F.2d 1462, 1470 (9th Cir. 1984). With respect to the exclusionary periods, Plaintiffs seek declarations that (1) the guidance documents' exclusionary period is unlawful, (2) Defendants must give the states a full 120-day exclusionary period after issuing an implementing memorandum, and (3) Defendants may not reduce the exclusionary period based on a state's actual implementation date if they did not provide the states sufficient time to implement those changes. Plaintiffs also seek a declaration that the Non-Citizen Guidance is unlawful, that LPRs are eligible for SNAP regardless of prior status, and that PWRORA's five-year waiting period does not apply to LPRs that are or were members of a Humanitarian Immigrant Group.

#### 1. Exclusionary Periods

Defendants do not meaningfully oppose Plaintiffs' request for declaratory relief that the exclusionary period is unlawful other than on the merits. The Court finds that the requested relief is appropriate because it will help settle the legality of the exclusionary periods and afford relief from the uncertainty caused by it.

With respect to Plaintiffs' request that the Court declare Defendants may not reduce the exclusionary period based on a state's implementation date unless they give states enough time to implement the changes, Defendants ask that the Court (1) set the exclusionary period to begin on the day Defendants circulated each guidance document and (2) allow Defendants to count variances that occurred before the states implemented the relevant changes. The Court denies Defendants' requests because they suffer from the same lack of notice and cause the same unfair surprise to Plaintiffs as setting the implementation date on the day of H.R. 1's enactment.

Although a state may generally not exclude variances that occur prior to the state's implementation, *see* 7 C.F.R. § 275.12(d)(2)(vii)(A), that prohibition hinges on the states receiving notice of a required implementation date. The Court declines to impose Defendants' conditions because Defendants' required implementation date is unlawful.

The Court's judgment will reflect that (1) the exclusionary period set forth in the Guidance Documents are unlawful, (2) Defendants must give the states 120 days after they issue an implementing memorandum and provide a required implementation date consistent with this opinion and order, and (3) Defendants must provide adequate notice of when a state must implement the changes under H.R. 1 in order to exclude errors prior to the state's implementation.

2. Non-Citizen Guidance

Defendants appear to rely solely on their merits arguments in opposing Plaintiffs' requested relief with respect to the Non-Citizen Guidance. As described above, Plaintiffs' challenge to the Non-Citizen Guidance is not moot. Defendants have continued to defend the legality of the Non-Citizen Guidance before this Court, and declaratory relief will clarify the legal requirements at issue and terminate the controversy giving rise to the parties' dispute. The Court's judgment will reflect that LPRs are eligible for SNAP regardless of prior status, and that PWRORA's five-year waiting period does not apply to LPRs that are or were members of a Humanitarian Immigrant Group.

## CONCLUSION

For the reasons discussed above, Plaintiffs' Motion for Summary Judgment (ECF No. 80) is GRANTED, and Defendants' Cross Motion for Summary Judgment (ECF No. 92) is DENIED. Judgment shall be entered accordingly.

DATED this 17th day of September 2026.

MUSTAFA T. KASUBHAI (he/him)
United States District Judge